Filed 8/5/14   Modified and Certified for Partial Publication 8/19/14 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| DARREN HAGER,<br><br>     Plaintiff and Respondent,<br><br>     v.<br><br>COUNTY OF LOS ANGELES et al.,<br><br>     Defendants and Appellants. | B238277<br><br>(Los Angeles County<br>Super. Ct. No. BC370326) |
| DARREN HAGER,<br><br>     Plaintiff and Appellant,<br><br>     v.<br><br>COUNTY OF LOS ANGELES et al.,<br><br>     Defendants and Respondents. | B239897<br><br>(Los Angeles County<br>Super. Ct. No. BC370326) |

        APPEALS from a judgment and order of the Superior Court of Los Angeles County, Victor E. Chavez, Judge.  Judgment is affirmed in part and reversed in part.  The order is affirmed.

        Love & Erskine, Richard A. Love and Beth A. Shenfeld for Plaintiff and Appellant and for Plaintiff and Respondent..

        Hurrell Cantrall, Thomas C. Hurrell and Melinda Cantrall for Defendants and Appellants and for Defendants and Respondents.

In a whistleblower retaliation lawsuit brought under Labor Code section 1102.5, subdivision (b) (hereafter section 1102.5(b)),[1] the plaintiff must establish a prima facie case of retaliation. The plaintiff must show he engaged in protected activity, his employer subjected him to an adverse employment action, and there is a causal link between the two. If the plaintiff meets his prima facie burden, the defendant has the burden to prove a legitimate, non-retaliatory explanation for its actions. To prevail, the plaintiff has to show that the explanation is a pretext for the retaliation. (*Patten v. Grant Joint Union High School Dist.* (2005) 134 Cal.App.4th 1378, 1384.)

In *Hager v. County of Los Angeles* ((Apr. 22, 2010, B208941) [nonpub. opn.]) (*Hager I*), we held that plaintiff Darren Hager could pursue his whistleblower retaliation lawsuit against his employers, defendants the County of Los Angeles and the Los Angeles County Sheriff's Department (collectively, County). The County appeals from a judgment entered after a substantial jury verdict in Hager's favor. Hager appeals from the postjudgment order denying his request for attorney fees.

The County's principal contentions on appeal address two errors with respect to the parties' burdens of proof. The County contends Hager did not prove that he engaged in a protected activity to establish a prima facie case of whistleblower retaliation (§ 1102.5(b)) because he did not "disclose information," as that term has been defined in *Mize-Kurzman v. Marin Community College Dist.* (2012) 202 Cal.App.4th 832, 858-859 (*Mize-Kurzman*). The County also contends the trial court erred in relying on the Public

---

[1]     At the time of the trial, former section 1102.5(b) provided: "An employer may not retaliate against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation." Amendments to this subdivision that became effective on January 1, 2014 (Stats. 2013, ch. 781, § 4.1) are not pertinent to our analysis. Subdivision (e) of section 1102.5 provided: "A report made by an employee of a government agency to his or her employer is a disclosure of information to a government or law enforcement agency pursuant to subdivisions (a) and (b)." All further citations to section 1102.5 are to the former version of the statute.
        All further undesignated statutory references are to the Labor Code.

2

Safety Officers Procedural Bill of Rights Act (POBRA) (Gov. Code, § 3300 et seq.) to exclude the County's evidence of past conduct not included as a basis to terminate Hager during the administrative proceedings but presented in this civil action as additional reasons to support its decision to terminate Hager. The County also challenges the sufficiency of the evidence to support the damages award, raises evidentiary errors, and asserts juror misconduct.

We initially affirmed in part and reversed in part, concluding the trial court did not err in excluding evidence of past conduct and there was no substantial evidence to support the economic damages awarded to Hager. The County and Hager petitioned for rehearing. The County argued in its petition that we affirmed the exclusion of evidence of its undisclosed reasons to terminate Hager by improperly relying on Evidence Code section 352 without any support in the record that the trial court engaged in balancing the probative value of this evidence against the prejudicial impact. Hager argued in his petition that we omitted key facts that his termination constituted a "blot on his resume" and significantly impaired his future earning capacity, which is sufficient evidence to support the jury's award of economic damages. We granted the petitions for rehearing to address these issues.

We conclude the trial court did not abuse its discretion in excluding evidence of undisclosed reasons for terminating Hager. The record contains affirmative indications the trial court considered and understood that the introduction of undisclosed reasons for the decision to terminate Hager was not relevant and was prejudicial. We further conclude there is no substantial evidence to support the jury's award of economic damages. Accordingly, we reverse that portion of the judgment, but in all other respects we affirm. We also affirm the order denying Hager's motion for attorney fees.

FACTUAL AND PROCEDURAL BACKGROUND

Hager worked for the Los Angeles County Sheriff's Department (LASD) as a deputy sheriff from 1988 to 2003. In 2000, Hager was appointed as the LASD liaison to a federal Drug Enforcement Agency (DEA) task force (DEA task force) investigating a large methamphetamine organization in the Antelope Valley. The DEA task force was

3

formed after Hager brought information to his command staff that a felony suspect was willing to provide the names of several methamphetamine dealers in the Antelope Valley in exchange for leniency. By all accounts, the DEA task force was a success.

The informant also gave Hager information that linked the disappearance of a deputy sheriff with the methamphetamine organization in the Antelope Valley. While working on the DEA task force, Hager obtained information that led him to believe the missing deputy sheriff had been murdered. Hager accused another deputy of being involved in the murder, the cover up, and the illicit methamphetamine trade in the Antelope Valley. It is the disclosure of deputy misconduct that is central to Hager's whistleblower retaliation lawsuit.

1. *Alleged Disclosure of Deputy Misconduct*

In June 1998, then off-duty deputy sheriff Jonathan Aujay, an ultra-marathon runner, disappeared while on a long-distance run at the Devil's Punchbowl County Park in Antelope Valley. The initial missing person's investigation concluded that Aujay disappeared or committed suicide.

In December 1999, homicide detective Larry Joseph Brandenburg learned from another deputy sheriff that Aujay may have been murdered and that deputy sheriff Richard Engels may have been involved. Brandenburg's captain, Frank Merriman, gave Brandenburg permission to reopen the cold case and investigate Aujay's disappearance.

On March 2, 2000, Brandenburg contacted Hager and asked Hager to speak to his informant about "dirty deputies." The informant told Hager that Engels was involved in narcotics and possibly in the disappearance of Aujay. Hager informed Brandenburg.

a. *March 23, 2000 Disclosure of Deputy Misconduct*

In a March 23, 2000 meeting, then assistant sheriff Larry Waldie was briefed on the information Hager had obtained regarding (1) the methamphetamine organization in the Antelope Valley, and (2) Engels's possible involvement in narcotics and Aujay's disappearance. Based on this information, Waldie approved LASD's participation in the DEA task force. The DEA task force's primary mission was to disrupt narcotics trafficking in the Antelope Valley. Hager, as a DEA task force officer, was ordered to

4

conduct only the narcotics investigation. Waldie specifically ordered Hager and the DEA task force not to investigate deputy sheriff wrongdoing or Aujay's disappearance. Any information the DEA task force learned concerning deputy sheriff wrongdoing was to be documented and passed on to either the Internal Criminal Investigations Bureau (ICIB) or the Internal Affairs Bureau (IAB), and any information concerning Aujay was to be passed on to the homicide bureau and Brandenburg.

b. *Hager's Daily Reports to Shreves*

While a member of the DEA task force, Hager reported to lieutenant Ronald Shreves on a daily basis. The DEA task force followed federal drug enforcement protocol and obtained information from cooperating sources, and as the investigation continued, obtained information through corroborating sources. The DEA task force also filed warrants and federal wiretap applications. The DEA task force made hundreds of arrests.

During the course of the DEA task force investigation, Hager asked informants about the missing deputy and received information that Aujay was killed because he discovered a methamphetamine lab while out on a long-distance run. Informants told Hager that Engels was at the methamphetamine lab when Aujay was killed. Hager's informants also linked Engels with Tom Hinkle, one of the targets of the DEA task force and a known methamphetamine dealer.

c. *Hager's Summary (September 2000)*

In September 2000, Shreves requested a meeting with command staff to update them regarding the DEA task force and to inform them of potential deputy misconduct. Hager prepared a summary that disclosed information the DEA task force had received regarding Aujay's disappearance. The "main" thrust of the meeting was the "potential that Aujay was murdered and a deputy sheriff might be involved."

d. *Hager's Summary (May 9, 2001)*

After the DEA task force arrested Hinkle, one of the targeted methamphetamine dealers in the Antelope Valley, Shreves asked Hager to prepare a summary of the information the DEA task force had received regarding Engels. The summary revealed

5

information linking Engels to Hinkle and to Aujay's disappearance. Shreves passed this information through the chain of command.

2. *Independent Investigation Discredits Hager's Disclosure of Deputy Misconduct*

As ordered, Hager also was disclosing information to Brandenburg as Brandenburg pursued the homicide investigation. During the course of his investigation, Brandenburg obtained information that Aujay had discovered a methamphetamine lab adjacent to Devil's Punchbowl County Park while on a long-distance run. Brandenburg was convinced that Engels was involved in an ongoing criminal drug conspiracy, and that Engels and some other unidentified individuals had murdered Aujay to prevent him from arresting them or exposing their criminal enterprise. Brandenburg prepared an affidavit for a search warrant to serve on Engels, but his captain would not let him take it to a judge. Brandenburg's partner testified that their captain did not think the information they had obtained was credible. Brandenburg's partner agreed with the captain.

Brandenburg went over his captain's head to present his investigation results to the command staff. Brandenburg was taken off the investigation.

a. *Shreves's Memo*

In February 2001, Shreves sent a memorandum to his command in which he addressed Brandenburg's homicide investigation. Shreves formed the opinion that the homicide bureau and the command staff were failing to "credibly investigate the disappearance and possible murder of . . . Aujay." Shreves also felt that the members of the DEA task force were "being cruelly and unnecessarily besmirched to a wide audience of department personnel."

b. *Holmes's Investigation*

In March 2001, after Shreves submitted his memo, sergeant Joe Holmes was assigned to investigate the information Brandenburg and Hager reported concerning Aujay's disappearance. Holmes interviewed Hager's initial informant who admitted during the tape-recorded session with Holmes that he had lied to Hager. Holmes testified he interviewed 60 people and there was not one piece of credible evidence linking Engels to drug trafficking in the Antelope Valley or to the murder, death, or disappearance of

6

Aujay. Many of the individuals previously interviewed by Hager denied making the statements attributed to them. Holmes also discovered that many of the reported statements were not credible. Holmes described the accusations against Engels as a "misinterpretation of information" on a "large scale."

Holmes did not believe that Engels was a suspect in Aujay's disappearance. He thought Hager was actively investigating Aujay's disappearance in violation of direct orders. Holmes also dismissed Brandenburg's conclusions that Aujay had been murdered and stated that the most likely scenario was Aujay had committed suicide.

At the conclusion of his investigation, Holmes met with command. Both Hager and Shreves were present. Shreves was critical of Holmes's conclusions and believed Holmes had not conducted a comprehensive investigation.

Shreves was ordered to write a memorandum identifying the deficiencies in Holmes's investigation. Shreves prepared a 56-page memorandum. Shreves explained in the memorandum that the DEA task force had received information that a deputy sheriff may have been involved with the methamphetamine organization, and Aujay may have been murdered by that organization. He noted the DEA task force had been "admonished not to conduct follow-up [regarding] alleged personnel wrongdoing or the alleged murder." Shreves felt the DEA task force was being "criticized for bringing forth uncorroborated information," but was ordered not to corroborate the information. As Shreves noted, "[t]o do no follow-up and also corroborate information is an impossible task."

In preparing the 56-page memorandum, Shreves relied on a synopsis Hager prepared. The synopsis contained representations regarding the content of federal wiretapped conversations.

3. *Hager's Termination*

Hager became the subject of an IAB investigation. Engels and four other deputy sheriffs filed a complaint against Hager. Shreves's 56-page memorandum focused the investigation on whether Hager had violated a direct order not to investigate Aujay's disappearance.

7

At the conclusion of the year-long IAB investigation, Hager was charged with conducting a personnel investigation and making false statements to his supervisors. The internal affairs investigator believed that Hager had misrepresented wiretapped conversations to support his theory that (1) Engels was involved in the methamphetamine organization in the Antelope Valley, and (2) Engels was one of the individuals involved in Aujay's murder, death, or disappearance.

Chief Neal Tyler reviewed the IAB investigation and concluded the appropriate discipline was termination. Tyler had been given a range of discipline options, which indicated the recommended discipline was suspension for 10 to 15 days. Tyler considered suspension, but he testified that suspension was not appropriate "for the series of offenses that [he] saw in this investigation over the two-year period."

In December 2002, Hager received a letter of intent to discharge. The letter indicated the IAB investigation had established Hager "conducted a personnel investigation regarding Deputy Richard Engels and recklessly accused Deputy Engels of associating with drug dealers and having knowledge/involvement in the alleged murder of Deputy Jonathan Aujay." The letter also stated the IAB investigation established Hager made false statements to Shreves "concerning information gleaned from Federal wire taps and/or various informants, which was used to support [his] theory that Deputy Richard Engels was involved in criminal acts with known drug dealers and may have been involved in the alleged murder of Deputy Aujay." LASD held two *Skelly*[2] hearings addressing these charges in January and July 2003, at which Hager was represented by counsel. On July 28, 2003, Hager learned he had been terminated.

In April 2003, before his second *Skelly* hearing, Hager filled out an application for disability retirement. Hager suffered neck and back injuries in March 2002 while on duty. His disability retirement was granted on September 3, 2003.

---

[2]     *Skelly v. State Personnel Bd.* (1975) 15 Cal.3d 194.

4. *Hager's Evidence of Retaliation*

Hager attacked the results of the IAB investigation, presenting evidence that he did not conduct an investigation into Engels's wrongdoing or Aujay's disappearance. Hager also discredited Holmes's investigation, and the IAB investigation because there was no mention of Hager's work on the DEA task force, and the investigators failed to interview other members of the DEA task force. Specifically, Hager noted that the foundation of both the Holmes investigation and the IAB investigation was that Hager's sources were not credible, but the investigators completely ignored that these same informants had given reliable and corroborated information to the DEA task force that led to numerous arrests. Hager also pointed out the inconsistency of being charged with conducting an unauthorized investigation and being criticized for conducting an incompetent investigation.

With respect to the charge that Hager had falsely reported wiretapped conversations, Hager testified that the information he relayed to Shreves were summaries prepared by others, and not verbatim transcriptions. Hager had been ordered to pass this information along so other deputy sheriffs could investigate deputy misconduct. When questioned about the false statements in the summaries, Hager took exception to the internal affairs investigator's conclusions that the information Hager relayed to Shreves was false or failed to include exculpatory statements. The jury also heard testimony that wiretapped conversations must be interpreted in context because the drug culture has its own language and code.

5. *Jury Verdict, Motion for New Trial, Appeal*

The jury returned a special verdict in Hager's favor, awarding $4,506,015 in damages. The award included $2,006,015 in lost earnings ($806,041 in backpay and $1,199,974 in future lost income), and $2,500,000 in non-economic damages.

The trial court denied the County's motion for new trial. Thereafter, the trial court denied Hager's request for attorney fees.

The County timely appeals from the judgment. Hager filed an appeal from the order denying attorney fees. We consolidated the appeals.

9

6. *Petitions for Rehearing*

After our original opinion issued, the County filed a petition for rehearing in which it again argued that the trial court erred in excluding evidence of Hager's past conduct (motions in limine), and erred in excluding Tyler's testimony of his undisclosed reasons for terminating Hager. The County contended our conclusion that this evidence was properly excluded under Evidence Code section 352 was legal error.

Hager filed a petition for rehearing in which he contended we omitted key facts that would have supported the jury's award of economic damages.

We granted the petitions to clarify our opinion on these two issues. Additional facts will be presented with the relevant issue in the discussion section.

DISCUSSION

*County's Appeal*

1. *Section 1102.5(b)*

Relying on *Mize-Kurzman*, *supra*, 202 Cal.App.4th 832, the County contends that Hager did not "disclose information" under section 1102.5(b) because the LASD already knew that Engels might have been involved in drug trafficking and in Aujay's disappearance before Hager disclosed this information. The County cites to evidence that Brandenburg or other unidentified deputy sheriffs, and not Hager, were the first to disclose Engels's alleged unlawful conduct.

As a preliminary matter, we are concerned here with whether Hager disclosed information in March 2000.[3] After that date, the reports to Shreves and up the chain of command cannot be considered "blowing the whistle," as Hager was ordered as part of an

---

[3] In Hager's brief, he alternatively argues that he made a disclosure to the DEA that is protected under section 1102.5(b). This assertion is not supported by citation to the record, nor does the record reflect any factual or legal theory that there is a causal connection between Hager's report to the DEA and retaliation by the LASD. We also reject Hager's arguments that the County has forfeited the issue, or is estopped from raising the issue because in *Hager I* the County admitted that Hager made a protected disclosure. An admission in a summary judgment motion or separate statement is not binding on the parties in subsequent proceedings. (*Myers v. Trendwest Resorts, Inc.* (2009) 178 Cal.App.4th 735, 746-747.)

10

internal personnel matter to report any further information he obtained during the course of the DEA task force investigation.

Section 1102.5(b) protects an employee from retaliation by his employer for making a good faith disclosure of a violation of federal or state law.  (§ 1102.5(b); *Patten v. Grant Joint Union High School Dist., supra*, 134 Cal.App.4th at p. 1384.)  A report made by an employee of a government agency to his employer is a disclosure of information to a government or law enforcement agency pursuant to section 1102.5(b).  (§ 1102.5, subd. (e); *Colores v. Board of Trustees* (2003) 105 Cal.App.4th 1293, 1308, 1312-1313.)  "This provision reflects the broad public policy interest in encouraging workplace whistle-blowers to report unlawful acts without fearing retaliation."  (*Green v. Ralee Engineering Co.* (1998) 19 Cal.4th 66, 77.)

a.      *Mize-Kurzman*

In *Mize-Kurzman, supra*, 202 Cal.App.4th 832, the court considered whether a jury had been adequately instructed on federal law limits applicable to state whistleblower protection.  (*Id.* at pp. 844-845.)  A special instruction to the jury stated, "[r]eporting publicly known facts is not a disclosure of information" within the meaning of section 1102.5.  (*Mize-Kurzman*, at p. 845.)  Consistent with federal law, the *Mize-Kurzman* court held reporting information that already was known to the employer did not constitute a protected disclosure.  (*Id.* at p. 858.)  Citing the Legislature's choice of the word "disclosing," and "discloses," in section 1102.5(b), the court reasoned the plain meaning and dictionary definition of "disclosure," is to " 'reveal something that was hidden and not known.' "  (*Mize-Kurzman*, at p. 858.)  The *Mize-Kurzman* court supported this interpretation of "disclosure" by relying on federal and state cases addressing protected disclosures.  (*Id.* at p. 859.)

The County reads *Mize-Kurzman, supra*, 202 Cal.App.4th 832 as limiting the protections of section 1102.5(b) to the first employee who discloses a violation of state or federal law that had not been *previously* disclosed by another employee.  No such "first report" limitation was discussed in *Mize-Kurzman*, appears in section 1102.5(b), or is addressed in the federal and state cases cited and relied on by the *Mize-Kurzman* court.

11

b.       *Mize-Kurzman Does Not Adopt a "First Report" Rule*

In *Mize-Kurzman, supra*, 202 Cal.App.4th 832, the plaintiff made four disclosures of unlawful conduct to the alleged wrongdoers.  (*Id*. at pp. 840-842.)  With respect to one of the disclosures of unlawful activity, Mize-Kurzman's supervisor testified at trial that she already was aware that programs receiving state funds could not discriminate against students, and with respect to two of the other disclosures, it was disputed at trial whether the community college policies Mize-Kurzman viewed as unlawful actually violated the law.  (*Ibid.*)  It was in this factual context that the court considered whether Mize-Kurzman made a protected disclosure under section 1102.5(b).  The court never considered whether a second employee who disclosed the same unlawful activity that Mize-Kurzman disclosed would or would not have been protected under section 1102.5(b).

c.       *Section 1102.5(b) Does Not Support a "First Report" Rule*

The plain language of section 1102.5(b) also does not limit whistleblower protection only to an employee who discloses unlawful conduct that had not been previously disclosed by another employee.  The verb "disclose" is not defined in the statute, and the *Mize-Kurzman* court gave the statutory term its plain and common sense meaning.  (See *Murphy v. Kenneth Cole Productions, Inc.* (2007) 40 Cal.4th 1094, 1103.)  But, words and phrases are construed according to context and approved usage of language.  (*California Mfrs. Assn. v. Public Utilities Com.* (1979) 24 Cal.3d 836, 844.)  While we accept the dictionary definition of "disclosure" as used by the court in *Mize-Kurzman, supra*, 202 Cal.App.4th 832, the court did not construe the statutory language in the context of the statute as a whole.

Subdivision (e) of section 1102.5, provides that a "report," by an employee of a government agency to his or her employer is a disclosure of information under section 1102.5(b).  A report does not necessarily reveal something hidden or unknown.  To the extent *Mize-Kurzman* has highlighted an inconsistency in the statute, that is, a public employee must merely "report" unlawful conduct, and other employees must "disclose," unlawful conduct, it is up to the Legislature to resolve this issue, not this court.

12

We also view the "first report" rule the County proposes as contrary to the legislative intent in enacting section 1102.5(b). Protection only to the first employee to disclose unlawful acts would defeat the legislative purpose of protecting workplace whistleblowers, as employees would not come forward to report unlawful conduct for fear that someone else already had done so. The "first report" rule would discourage whistleblowing. Thus, the County's interpretation is a disincentive to report unlawful conduct. We see no such reason to interpret the statute in a manner that would contradict the purpose of the statute.

d. *Cases Cited in Mize-Kurzman Do Not Support a "First Report" Rule*

The federal cases cited in *Mize-Kurzman, supra,* 202 Cal.App.4th 832, do not articulate a "first report" rule. *Mize-Kurzman* cites to federal law for the proposition that the report of information "that was already known did not constitute a protected disclosure." (*Id.* at p. 858.) One of those federal cases is *Huffman v. Office of Personnel Management* (Fed.Cir. 2001) 263 F.3d 1341 (*Huffman*),[4] which addressed, among other things, the question of whether complaints to a supervisor about the supervisor's conduct constitute a protected disclosure under the federal Whistleblower Protection Act of 1989 (codified in scattered sections of 5 U.S.C.) (hereafter, the federal Act). (*Huffman*, *supra*, at pp. 1344, 1347.) *Huffman* did not articulate a "first report" rule as between two employees reporting unlawful conduct.

The *Huffman* court followed its precedent that disclosures to the wrongdoer are not protected because the wrongdoer already knew of the misconduct. (*Huffman*, *supra*, 263 F.3d at pp. 1349-1350.) The court also supported its decision by relying on the dictionary definition of "disclosure." (*Ibid.*) The court found "significant" that "Congress in the [federal] WPA did not use a word with a broader connotation such as 'report' or 'state.' " (*Id.* at p. 1350.) As the *Huffman* court noted, the purpose of the

---

**4** *Huffman, supra,* 263 F.3d 1341, was superseded by the Whistleblower Protection Enhancement Act of 2012 (WPEA) (Pub.L. No. 112-199 (Nov. 27, 2012) § 101(b)(2)(C), 126 Stat. 1465, 1465-1466).

federal Act is to encourage disclosures to those that are likely to remedy the wrong, and "[t]he wrongdoer is not such a person." (*Ibid*.)

On this point, *Huffman* is not consistent with California courts applying section 1102.5(b) when public employees report unlawful conduct. (See, e.g., *Jaramillo v. County of Orange* (2011) 200 Cal.App.4th 811, 825-827.) In *Jaramillo*, the court held that a report of wrongdoing by a public employee to the very person who is engaged in the wrongdoing is covered by the statute. (*Id*. at pp. 825-826; see also *Gardenhire v. Housing Authority* (2000) 85 Cal.App.4th 236, 240, 242-243 [housing authority employee who reported to authority commissioners illegal conduct of employee and contractor is covered by the statute].)

Although the *Mize-Kurzman* court cites our decision in *Colores v. Board of Trustees, supra,* 105 Cal.App.4th 1293, as in line with *Huffman*, in that case we did not address the issue of whether a report to a wrongdoer is a protected disclosure, or what constitutes a protected disclosure. Rather, we concluded that a public employee is entitled to the protection of section 1102.5(b) if she reported wrongdoing to her agency and had no need to inform some other governmental agency in order to qualify as a whistleblower. (*Colores v. Board of Trustees,* at pp. 1312-1313.)

Likewise, *Patten v. Grant Joint Union High School Dist.*, *supra*, 134 Cal.App.4th 1378, also cited by the *Mize-Kurzman* court, does not discuss what constitutes a protected disclosure, but relies on *Colores v. Board of Trustees* for the proposition that a state employee discloses information protected under section 1102.5(b) when she reports the activity to the supervisor in her own agency. (*Patten v. Grant Joint Union High School Dist.*, at pp. 1385-1386.) Cases are "not authority for propositions neither considered nor discussed in the opinion." (*In re Muszalski* (1975) 52 Cal.App.3d 500, 504.)

*Mize-Kurzman*, *supra*, 202 Cal.App.4th 832, also cited two federal cases that held reporting publicly known information was not a protected disclosure under the federal Act. (*Id*. at p. 8585.) These cases involve an administrative judge's disclosure in an opinion that a federal agency had incorrectly interpreted federal laws reflected in prior decisions of administrative judges (*Meuwissen v. Department of Interior* (Fed.Cir. 2000)

14

234 F.3d 9, 12-13),[5] and a disclosure that a federal agency failed to reopen a claim for retirement benefits after it was revealed to the agency that it had incorrectly interpreted civil service laws (*Francisco v. Office of Personnel Management* (Fed.Cir. 2002) 295 F.3d 1310, 1313-1314).  In these cases, the agency's alleged misconduct was publicly known in the erroneous decision of the administrative judge, and in the agency's decisions erroneously denying benefits.

The report of "publicly known" information or "already known" information is distinct from a rule in which only the first employee to report or disclose unlawful conduct is entitled to protection from whistleblower retaliation.  Section 1102.5(b) should be given a broad construction commensurate with its broad purpose.  (*Green v. Ralee Engineering Co.*, *supra*, 19 Cal.4th at p. 77.)

After the issues were fully briefed, Hager brought to the court's attention that Congress has amended the federal Act to clarify that a disclosure is protected even if the information has been previously disclosed.  (See *ante*, fn. 4.)  Although instructive, we reach our conclusion based on the plain language of section 1102.5(b).

We also reject the County's interpretation that the statutory protections of section 1102.5(b) do not apply when the disclosure of information addresses the wrongdoing of a fellow employee.  In support of its argument, the County relies on an uncodified preamble to the 2003 amendments to section 1102.5.  (Stats. 2003, ch. 484, § 1; *McVeigh v. Recology San Francisco* (2013) 213 Cal.App.4th 443, 469-470.)  The County highlights in the preamble that the protection of section 1102.5 applies only to those employees reporting "corporate wrongdoing."  We agree with the conclusion reached in *McVeigh v. Recology San Francisco*, that section 1102.5(b) protects disclosure of unlawful activity by third parties such as contractors and employees, and thus by its terms

---

[5]    *Meuwissen v. Department of Interior*, *supra*, 234 F.3d at pages 12 through 13 was legislatively overruled by the WPEA to the extent that the court found the appellant did not make a "disclosure" because the administrative ruling with which he disagreed was already publicly known.  (See *ante*, fn. 4.)

15

cannot be interpreted to be limited to unlawful conduct on the part of an employer or other high-ranking official. (*McVeigh v. Recology San Francisco*, at pp. 469-472.)

2. *The Trial Court Did Not Err in Excluding the County's Undisclosed Reasons to Justify Hager's Termination*

The County contends the trial court committed prejudicial error when it granted Hager's motions in limine to exclude certain incidents in Hager's employment history unrelated to the charged policy violations, and further erred when it barred Tyler from testifying as to the undisclosed reasons for his decision to terminate Hager. As shall be discussed, we conclude the trial court's rulings were a proper exercise of discretion, and therefore there was no miscarriage of justice. (Evid. Code, § 354.)

a. *Background Facts*

(1). *Motions in Limine*

The County notified Hager that he was terminated for two policy violations, namely, conducting an unauthorized personnel investigation and falsely reporting federal wiretapped conversations. Before trial, Hager filed motions in limine to exclude evidence unrelated to the charged policy violations, including evidence of: (1) "off-duty actions which resulted in IAB, ICIB, or District Attorney inquiries, or civilian complaints, which were not resolved or a basis for termination" (motion in limine no. 2); (2) Hager's "relationship with [his former girlfriend] Liza Mattos" and "any civil complaints or investigations which Liza Mattos initiated against plaintiff" (motion in limine no. 4); (3) "evidence of on-duty use of force incidents which [LASD] found to be within policy" (motion in limine no. 5); and (4) the "Mandalay Bay Hotel incident" (motion in limine no. 6). (Capitalization omitted.) Hager moved to exclude this evidence on several grounds, including it was inadmissible under provisions of POBRA (Gov. Code, § 3304, subd. (d)), or under the Evidence Code as instances of prior specific conduct (Evid. Code, § 1101, subd. (a)), impermissible character evidence (Evid. Code, §§ 786, 787), or inadmissible hearsay (Evid. Code, § 1200). Hager also argued the evidence should be excluded as not relevant (Evid. Code, § 210), and under Evidence

16

Code section 352 as the evidence was unduly prejudicial, collateral, too remote, and required or constituted an undue consumption of time.

During oral argument on motion in limine no. 2, Hager's counsel argued that the off-duty incidents were "collateral" as Hager "was allegedly terminated for conducting a personnel investigation regarding Deputy Richard Engels and then, secondarily, allegedly making a false statement to his supervisor concerning the information gleaned from wiretaps and informants." Hager's counsel acknowledged that Tyler testified at his deposition[6] he considered undisclosed reasons for his decision, but under POBRA the Department not only had to "do an investigation, but charge and notify [Hager] of intent to impose discipline within one year." In response, the County argued POBRA did not apply in a civil action in which it had the burden of establishing a non-retaliatory reason for its decision to terminate Hager. The trial court granted the motion without indicating on the record the specific grounds for exclusion. The trial court also granted the remaining motions, referring to its ruling on motion in limine no. 2. The trial court, however, stated it would reconsider the issue during trial.

(2).    *Evidence Code Section 402 Hearing (402 Hearing)*

While Tyler was testifying, the County requested a 402 hearing outside the presence of the jury. Tyler testified that it was LASD policy to consider an employee's past performance, disciplinary history, and instances of on- and off-duty conduct when determining the appropriate discipline. Tyler took into consideration "the past disciplinary history for the three cases that had been founded" and that Hager had been

---

[6]    In opposition, the County cited to Tyler's deposition testimony in which he testified: "I believe I informed him that the offenses that I discovered by reading the investigative file on this case seemed to have factors in common with previous concerns about [Hager's] performance . . . . [¶] And the factors I was concerned about having to do with judgment and care and caution in doing an important, high-stakes job seemed to reoccur in this case, whereas they appeared in previous circumstances in [Hager's] career involving law enforcement decision-making or off-duty conduct. [¶] And because of the connection between the previous situations I was concerned about and the problems in this case, I felt that I had to consider the past performance as well as the current case."

placed on performance mentoring status "in a running fashion between about 1996 and 2001," based upon on- and off-duty behavior.

Tyler did not specifically identify the three cases. In 1996, Hager accepted a written reprimand for an incident in which he threatened his former girlfriend. In 2001, his former girlfriend complained that Hager physically assaulted her on or about July 4, 1996. An investigation into the incident concluded the charge founded, and in October 2002, two months before Hager received the letter of intent to discharge, a five-day suspension was recommended. Tyler signed the disposition sheet recommending the discipline. In November 2002, an internal affairs investigation into an incident at the Mandalay Bay Hotel (motion in limine no. 6), concluded the charge founded and a five-day suspension was recommended. Tyler signed the disposition sheet recommending the discipline. Hager did not receive notice of intent to discipline him for either of these 2002 incidents.

On cross-examination, Tyler conceded Hager had no notice that these undisclosed reasons were a basis for his termination. Given the lack of notice, Hager's counsel posed the following question: "And there's no ability of the deputy to respond to these hidden factors that were not disclosed; correct?" Tyler responded, "Well, the opportunity to respond would have occurred in a *Skelly* hearing." Hager, however, was not formally advised of Tyler's undisclosed reasons for his decision to terminate him in order to respond at the *Skelly* hearing. (See fn. 6, *ante*.)

The trial court ruled that the "defense is precluded from going into this area."

(3). *Motion for New Trial*

Following the jury's verdict, the County moved for a new trial on several grounds, including that the trial court's evidentiary rulings on the motions in limine and following Tyler's testimony at the 402 hearing denied the jury the opportunity to consider evidence of past conduct that Tyler relied on when he decided to terminate Hager. The trial court denied the motion.

In its motion, the County argued that POBRA did not apply in a civil action and it was entitled to present evidence of a legitimate, non-retaliatory reason for its decision to

terminate Hager even though Hager had not been notified that his termination was based on additional conduct not disclosed during the administrative proceedings. Citing *Mays v. City of Los Angeles* (2008) 43 Cal.4th 313, 321-322, the court reasoned that under POBRA (Gov. Code, § 3304, subd. (d)), the officer must be notified of the conduct for which discipline may be imposed if he or she wishes " 'to defend against possible discipline.' " Thus, the trial court concluded the undisclosed, past conduct "was not relevant to the trial of this action," and no procedural irregularity occurred at trial affecting the County's rights with respect to these rulings.

b. *Exclusion of Undisclosed Reasons for Hager's Termination*

We review the trial court's decision to exclude evidence for abuse of discretion and will reverse only if there is a clear showing of abuse of discretion. (*Ceja v. Department of Transportation* (2011) 201 Cal.App.4th 1475, 1480-1481; *Tudor Ranches, Inc. v. State Comp. Ins. Fund* (1998) 65 Cal.App.4th 1422, 1431.) "If evidence is excluded on an improper objection but the evidence excluded is subject to objection on a different ground, it does not matter that the reason advanced by counsel or relied upon by the court was wrong. [Citations.] If the exclusion is proper upon any theory of law applicable to the instant case, the exclusion must be sustained regardless of the particular considerations which may have motivated the trial court to its decision." (*Philip Chang & Sons Associates v. La Casa Novato* (1986) 177 Cal.App.3d 159, 173; 9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 347, pp. 398-399.)

Even where evidence has been erroneously excluded, the judgment or decision shall not be reversed unless the reviewing court concludes the exclusion resulted in a miscarriage of justice. (Cal. Const., art. VI, § 13; Evid. Code, § 354.)

Here, the trial court did not abuse its discretion. The evidence of Tyler's undisclosed reasons to terminate Hager, along with other past conduct (motions in limine), was not erroneously excluded.

(1). *Properly Excluded as Not Relevant*

Although the County argues that the trial court excluded this evidence by importing POBRA rights into a civil action, this characterization does not accurately

reflect the trial court's discretionary rulings. As a public safety officer, Hager had due process rights (*Skelly v. State Personnel Bd.*, *supra*, 15 Cal.3d at pp. 207-208) and rights under POBRA (Gov. Code, § 3301), which included "notice that the public agency, having completed its investigation into the alleged misconduct within the statutory period, has decided that it may take disciplinary action against the officer for specified misconduct." (*Mays v. City of Los Angeles*, *supra*, 43 Cal.4th at p. 325; *Townsel v. San Diego Metropolitan Transit Development Bd.* (1998) 65 Cal.App.4th 940, 949.) The County's reasons for its decision to terminate Hager based upon specific misconduct had been presented to Hager in accordance with these rights before his *Skelly* hearing, which gave him the "right to review the material on which the discipline was based." The undisclosed reasons were vaguely communicated to Hager's counsel before the *Skelly* hearing, but were not provided to him in violation of these rights.

Given this employment context, in which the County's discipline decisions affect vested rights and must satisfy certain notice requirements, the trial court exercised its discretion to exclude evidence of undisclosed reasons for Tyler's decision to terminate Hager on relevancy grounds, and not based upon a POBRA violation.[7] Even Tyler testified during the 402 hearing that much of the evidence sought to be excluded in the motions in limine did not factor into his decision to terminate Hager.

The County draws a distinction between Hager's employment rights and its right to defend this civil action arising from Hager's termination. The County argues that even if it were later determined that its stated reasons for terminating Hager were untrue, it would not be liable under section 1102.5(b) because the whistleblower statute does not prohibit lying, it prohibits retaliation for engaging in a protected activity. This legal principle addresses an employer's honest belief in the stated reasons for terminating the

---

[7]     In its petition for rehearing, the County cites to the trial court's ruling on the motion for new trial, stating that the trial court specifically held that evidence of other acts of misconduct was properly excluded under POBRA. The County omits the final sentence of the trial court's reasoning in which it concludes that the "past conduct in question, therefore, was not relevant to the trial of this action."

employee, not the situation in which the employer states reasons for its decision to terminate based upon specific misconduct, and then adds additional reasons to justify the termination. (See *Wills v. Superior Court* (2011) 195 Cal.App.4th 143, 151, 170-171.)

We reject the County's contention that the trial court abused its discretion because the evidence of its legitimate and non-retaliatory reasons, whether disclosed or undisclosed, cannot be excluded as it is a main issue in the case. The trial court's evidentiary ruling did not preclude the County from offering into evidence non-retaliatory reasons for terminating Hager based upon the charged policy violations, only evidence of undisclosed reasons that, on balance, had no probative value.

Moreover, none of the cited cases the County relies on to challenge the trial court's evidentiary rulings presents the unique circumstances of this case or holds the trial court lacks discretion to make evidentiary rulings in a given case to exclude evidence that is not relevant. Many of the cited cases reversing evidentiary rulings address the admission of "pattern and practice" evidence, sometimes referred to as "me-too" evidence, which was offered to show pretext. (See *Johnson v. United Cerebral Palsy/Spastic Children's Foundation* (2009) 173 Cal.App.4th 740, 759-767 [evidence admissible to show employer's intent]; *Pantoja v. Anton* (2011) 198 Cal.App.4th 87, 109-116 [evidence admissible to show defendant's intent]; *Bihun v. AT&T Information Systems, Inc.* (1993) 13 Cal.App.4th 976, 988-989, disapproved on other grounds by *Lakin v. Watkins Associated Industries* (1993) 6 Cal.4th 644, 664 [evidence relevant as "operative facts" of employer's knowledge of a supervisor's reputation and complaints from other female employees].) In contrast, evidence of an employee's conduct unrelated to his termination, is properly excluded under section 352 of the Evidence Code. (See *McLain v. Great American Ins. Companies* (1989) 208 Cal.App.3d 1476, 1487.)

(2). *Properly Excluded under Evidence Code Section 352*

The undisclosed reasons for Hager's termination also were properly excluded under Evidence Code section 352. The trial court has discretion to exclude evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue

21

prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) The prejudicial effect of this evidence was significant. There was a risk the undisclosed reasons that Tyler considered, such as Hager lacked judgment, which justified performance mentoring status in 1996, and that Hager was embroiled in a tumultuous relationship with his former girlfriend, would have been used as improper character evidence. If admitted into evidence, there was a potential for the jury to use this information to punish Hager because he is a bad person, and not to logically evaluate the misconduct associated with the charged policy violations that occurred while Hager was a member of the DEA task force.

The County contends that we cannot affirm the exclusion of this evidence on alternate grounds because the trial court did not make an affirmative record of its exercise of discretion to facilitate meaningful review. (See *Ramona Manor Convalescent Hospital v. Care Enterprises* (1986) 177 Cal.App.3d 1120, 1137.) We disagree.

Although our original opinion did not fully discuss the trial court's obligation to weigh the probative value of this evidence against the prejudicial effect, the record contains affirmative indications the trial court fully understood and executed its duty before exercising its discretion. The trial court determined this evidence was not relevant because it was not the basis for the charged policy violations that resulted in Hager's termination, and by so finding, the admission of this evidence would have been prejudicial, collateral, and an undue consumption of time. The record establishes that the court considered the matter and took time to exercise its discretion. We do not interpret case law as requiring anything more. Under the circumstances of this case, the trial court did not abuse its discretion.

The County maintains this conclusion is at odds with *Brown v. County of Los Angeles* (2012) 203 Cal.App.4th 1529, a decision filed by Division Two of this court. We are not bound by decisions of other Courts of Appeal. *Brown* is nevertheless distinguishable because the evidentiary ruling at issue in that case was based upon a misunderstanding of the law that led to the exclusion of the reason for the plaintiff's termination. (*Id.* at pp. 1534-1535, 1537-1538, 1545-1550.) In this case, the rulings on

the motions in limine, revisited during the 402 hearing when Tyler revealed the undisclosed reasons for terminating Hager, were based upon an exercise of discretion. Unlike *Brown*, the trial court's evidentiary rulings did not foreclose the County from introducing evidence of the non-retaliatory reasons for its decision to terminate Hager for the charged policy violations.[8]

3. *Substantial Evidence Supports the Verdict, But the Economic Damages Must Be Reversed for Lack of Substantial Evidence*

The County contends that Hager did not meet his burden to show that the decision to terminate him for falsely reporting wiretapped conversations was a pretext. The County also challenges the sufficiency of the evidence to support the economic damages awarded for past and future earnings because Hager was disabled and could not perform the job of deputy sheriff with or without accommodations. We agree on the second contention, as shall be discussed, that portion of the jury's damages award is not supported by substantial evidence.

"When a party contends insufficient evidence supports a jury verdict, we apply the substantial evidence standard of review. [Citation.]" (*Wilson v. County of Orange* (2009) 169 Cal.App.4th 1185, 1188.) "We must 'view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor . . . .' [Citation.]" (*Ibid*.) " '[N]either conflicts in the evidence nor " 'testimony which is subject to justifiable suspicion . . . justif[ies] the

---

[8] The County also argues that Hager was permitted to introduce evidence that he was a good deputy sheriff, which included his work on the DEA task force, and his "outstanding" rating by Tyler on his 2000 performance review, while the County was barred from introducing evidence that Hager was a bad deputy sheriff. Hager had the burden to show the stated reasons for his termination were a pretext, and his evidence focused on the period when he worked on the DEA task force. Our review of the trial transcript reveals that the jury heard ample evidence that Hager was not a competent deputy sheriff while working as a member of the DEA task force, and Hager acted recklessly while a member of the DEA task force. Additionally, Tyler also testified that he considered suspension, but did not "feel that it was the right level [of discipline] to come in at for the series of offenses that [he] saw in this investigation over the two-year period."

23

reversal of a judgment, for it is the exclusive province of the trier of fact to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.' " [Citations.]' " (*Lenk v. Total-Western, Inc.* (2001) 89 Cal.App.4th 959, 968.) Therefore, our analysis begins and ends with the determination as to whether there is any substantial evidence contradicted or uncontradicted to support the verdict in Hager's favor.

a. *Substantial Evidence Supports the Verdict that Terminating Hager for Falsely Reporting Wiretapped Conversations was a Pretext*

The County asserts there was overwhelming evidence presented at trial that Hager falsely interpreted wiretapped conversations, and no relevant contradictory evidence to show otherwise. In support of this argument, the County cites to testimony and evidence of inaccurate transcriptions, while Hager responds with a citation to the testimony of a federal agent and member of the DEA task force who explained to the jury the difficulty in translating wiretapped conversations because criminals often talk in "code." The County overlooks the testimony that supports the verdict in Hager's favor.

(1). *Background Facts*

During trial, the County presented evidence that in the course of the IAB investigation, LASD discovered Hager had falsified certain wiretapped conversations, setting forth several examples where the information was inaccurate or exculpatory information had not been reported.[9] The County focuses on two illustrative wiretapped conversations. In the first conversation, Hager reported that Hinkle, a target of the DEA task force, had responded in the affirmative to the caller's question that he had "the guy handled," which appeared to suggest that Hinkle had "man-handled" someone. The jury heard that this statement was inaccurate as the caller asked, " 'You got me handled?' "

---

[9] As we noted in *Hager I*, this case has a procedural past in federal district court. (*Hager I*, *supra*, B208941, at [pp. 3-4].) In the federal action, as the County points out in its opening brief, the district court reviewed the wiretapped conversations, and the district court concluded that Hager misrepresented several wiretapped conversations. In *Hager I*, we addressed this issue, concluding it was one of numerous, factual issues that needed to be resolved at trial. (*Id.* at [p. 13].)

Testimony elicited indicated the latter interpretation refers to drugs. The second conversation also involved Hinkle. The caller advised Hinkle that homicide detectives came to the caller's house to talk to her. Hager reported that the caller "advised Hinkle that she and her mother pretended that she was not home so she could talk to Hinkle first." Hager's report omitted allegedly exculpatory statements made by Hinkle in which he told the caller to talk to the homicide detectives because "there ain't nothing to tell them bad." The internal affairs investigator testified that Hinkle's statement was exculpatory and should have been included in Hager's report. The internal affairs report detailing the inaccuracies in Hager's reports of the wiretapped conversations was admitted into evidence and chronicled several other calls from Hinkle's home phone during a two-month period.

Hager explained that he did not listen to transcripts of wiretapped conversations, but instead looked at summaries called "line sheets" prepared by civilians. Line sheets are not verbatim transcriptions. Asked specifically about failing to report Hinkle's response to the caller in which Hinkle encouraged the caller to talk to homicide detectives, Hager testified it was not exculpatory in the sense that it showed Hinkle had nothing to hide. Hager also testified about a wiretapped conversation in his reports to Shreves between two callers in which Hager reported that one of the callers "sarcastically said that Hinkle could kill a cop." When the actual transcript revealed that the caller said, " 'Like [Hinkle's] going to kill a cop,' with a different connotation than 'Hinkle could kill a cop.' " Hager reiterated that he did not write the synopsis of that call.[10] Hager testified that he accurately reported to Shreves the wiretap information he received regarding Hinkle.

The jury also had an opportunity to review the IAB investigation report, which contained the transcriptions, Hager's summary, and the investigator's analysis.

---

[10]    Hager was asked, "Sir, isn't it true that the actual wiretap states, 'like Tom's going to murder a cop'?" The word "murder" does not appear in the investigator's report. Hager's response focused on the interchangeable terms of "murder," and "kill," which in his view did not constitute a false report.

(2). *Inconsistencies in LASD's Stated Reason for Terminating Hager*

In order to establish the decision to terminate Hager for falsely reporting wiretapped conversation was a pretext, and the real reason was in retaliation for reporting deputy misconduct, Hager must show " 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them "unworthy of credence," [citation] . . . . [Citations.]' [Citations.]" (*Hersant v. Department of Social Services* (1997) 57 Cal.App.4th 997, 1005.) From this evidence, the factfinder can infer that the employer did not act for the stated non-retaliatory reasons. (*Ibid*.)

Hager has set forth several such inconsistencies and implausibilities to support the jury's verdict that the stated reason, that is, falsely reporting wiretapped conversations, was unworthy of credence. As part of his work on the DEA task force, Hager obtained summaries and synopses of wiretapped conversations, which he believed set forth information that he had been ordered to report to Shreves. Hager testified that he did not interpret the wiretapped conversations, and took exception to the characterization that, as summarized in his reports to Shreves, the information was false or misleading. As described above, the jury could have recognized the inherent weakness in the County's stated reason for terminating Hager, when under cross-examination, Hager was asked to admit that the summary of a wiretapped conversation in which the word "kill" was used instead of "murder," constituted a false report that justified his termination. Moreover, the jury had an opportunity to examine the IAB investigator's file, setting forth what he believed were the false reports. The jury might have agreed with Hager, and not the investigator, that the differences between Hager's report and the IAB investigator's interpretation of the wiretapped conversations were not significant, or the use of "code" between the callers was subject to interpretation and did not establish Hager made false reports. There was sufficient evidence from which the jury could have concluded this stated reason for Hager's termination was pretextual.

26

b.   *Substantial Evidence Does Not Support the Verdict of Economic Damages*

Lost actual earnings may be proved with reasonable certainty and are recoverable as an element of special damages.  (*Handelman v. Victor Equipment Co.* (1971) 21 Cal.App.3d 902, 906.)  The County challenges the jury verdict awarding $2,006,015 in lost actual earnings.

(1).   *Background Facts*

In March 2002, Hager injured his neck and back while chasing a suspect.  He went out on medical disability in April 2002.

In April 2003, Hager applied for, and was later granted, medical disability retirement as a result of his back and neck injuries.  In his application, Hager checked "no," to the question of whether he would be willing to accept another position he could perform within the County that would not result in a loss of income.  Hager explained at trial that as of April 2003, his doctor told him that if he did not have a recommended surgical procedure he could not perform the physical duties of a deputy sheriff.  Hager did not undergo surgery, explaining to the jury that he would have, but he had no job to return to following the surgery and there were risks associated with the surgery.

Hager called as an expert an orthopedic surgeon who reviewed Hager's medical records and obtained information regarding the job classification of a deputy sheriff.  The expert opined that Hager could not meet the requisite job classification to perform the duties of a deputy sheriff as of 2003.  The medical expert testified Hager could undergo a procedure called "disk fusion" to ameliorate or cure Hager's neck injury.  There was no guarantee, however, that Hager would regain complete mobility in his neck after the surgical procedure.  Over objection, Hager's counsel asked the medical expert the following question:  "Dr. Kreitenberg, assuming a good result, if you will, on a two-level fusion, did you have an opinion whether or not Deputy Hager could perform at the end of the four to six months the classifications of a deputy sheriff?"  The doctor responded: "With a good result, yes, he could return to arduous work," as described in the deputy sheriff job classification.

Hager's medical expert testified that Hager was not totally disabled from any work. The expert, however, clarified that with two-level disk disease, Hager would have difficulty with the very arduous work of a Class IV deputy sheriff.

Hager's economic expert stated her opinions on his lost earnings were based upon the assumption that he was working as a deputy sheriff. The economist calculated lost earnings from the date of termination to the date she prepared her report. Her calculations were based on Hager's rate of pay in effect at the time he last worked. The economist calculated backpay at either $952,275 or $915,539, depending upon certain variables with a credit of $127,866 for past pension benefits received. Future lost earnings, based upon retirement at age 55, were calculated at either $2,765,243 or $2,562,213, depending upon certain variables, with a credit of $1,126,343 for past pension benefits received. Adding overtime, the economist calculated Hager's total loss of earnings at either $3,514,489 or $3,249,357, depending upon certain variables. These calculations were offset by the value of past and future medical pension benefits ($1,254,206), leaving a net loss of earnings in the range between $2,260,283 and $1,995,151.

Hager testified that he applied to "places" to obtain employment in the fields of private investigation, security management, and personal protection. The salary for these positions was in the range of $50,000 to $100,000. Hager testified that during the interviews, he had to disclose that he was terminated for falsifying affidavits and making false allegations. Hager did not identify the interviews in which the subject came up. Hager also did not further testify regarding his efforts to obtain employment. He was unable to secure employment in any of these fields.

The jury awarded $2,006,015 in economic damages.

(2). *Substantial Evidence Does Not Support Backpay Damages*

Citing *Davis v. Los Angeles Unified School Dist. Personnel Com.* (2007) 152 Cal.App.4th 1122 (*Davis*), the County contends Hager is not entitled to recover backpay ($806,041) because the evidence presented at trial established that when Hager was terminated he was medically disabled and was unable to perform the duties of a

28

deputy sheriff. Our review of the jury's award of damages is limited. (*Pannu v. Land Rover North America, Inc.* (2011) 191 Cal.App.4th 1298, 1321-1322 & fn. 18.) Given the nature of the issue framed by the County, we must determine whether the damages award is supported by substantial evidence. (*Id.* at p. 1322, fn. 18.)

In *Davis*, *supra*, 152 Cal.App.4th 1122, the court concluded that a wrongfully demoted employee was not entitled to recover backpay because he had been placed on nonindustrial disability by his doctor *before* being demoted and eventually terminated. (*Id.* at pp. 1127-1128, 1141.) Upon rescinding the demotion, the employee did not obtain a release from his doctor stating he was able to work in any capacity and, therefore, he was not reinstated. (*Id.* at p. 1129.) Thus, the employee did not work and could not work due to his disability, which predated any wrongful conduct and was not work-related. (*Id.* at p. 1133.) Invoking traditional causation principles, the court concluded the employer could not be held responsible for backpay because the employee would have sustained the loss due to his disability even in the absence of any wrongful demotion. (*Id.* at pp. 1133-1141.)

Like *Davis*, the County established that Hager took medical disability leave (unrelated to the charged policy violations that led to his termination) *before* he was terminated. Hager's medical expert testified he was disabled as of 2003 and could not perform the job functions of a deputy sheriff. Although there was testimony that Hager's condition might have improved with surgery, Hager did not undergo surgery and was not "ready, willing, and able" to return to work. Thus, at trial there was no evidence that Hager would have been able to work as a deputy sheriff. Accordingly, Hager is not entitled to recover backpay because he would have sustained the loss due to his disability even if the County had not terminated him.

Hager, however, argues that the County's wrongful conduct in terminating him has "forever destroyed [his] ability to secure any replacement employment in the field in which he is trained." Relying on his inability to obtain employment, Hager distinguishes *Davis*, a nonindustrial disability, with his, likening his situation to an industrial disability.

29

We reject this comparison. Hager's medical disability, that is, injury to his neck and back, is unrelated to his termination or damage to his reputation.

Hager also relies on *SASCO Electric v. Fair Employment & Housing Com.* (2009) 176 Cal.App.4th 532, to argue that an employee is entitled to backpay unless the employer shows the employee is completely unable to work in any capacity because of his disability. *SASCO* is inapposite. In *SASCO*, unlike in *Davis*, the employer failed to prove that the employee's work restrictions during her pregnancy could not have been accommodated. (*SASCO*, at pp. 543-544.) In this case, like *Davis*, Hager obtained a medical leave and did not seek an accommodation to return to active duty in any capacity. Thus, there was no evidence in the record that Hager would have worked, nor could he have worked as a deputy sheriff with or without accommodations, unless he had surgery and obtained a "good result." The award of backpay cannot stand.

(3). *Future Loss of Earnings was Speculative*

The County contends the jury's award of future loss of earnings ($1,199,974) is speculative because there is no evidence to show with a reasonable degree of medical certainty that had Hager undergone disk fusion surgery he could have returned to work and performed the duties of a deputy sheriff. The medical expert testified if Hager underwent disk fusion surgery, "[w]ith a good result . . . he could return to arduous work" as a deputy sheriff.[11] The economist's calculations of future loss of earnings were based upon the assumption that Hager would have returned to work as a deputy sheriff and worked until he was 55. The economist agreed that if her assumption was incorrect, that is, if Hager could not return to work as a deputy sheriff, her calculations were incorrect.

" 'Front pay,' as the term is used in employment litigation, is a measure of damages for loss of future income, as opposed to backpay, which is lost-wages damages through the time of trial." (*Horsford v. Board of Trustees of California State University* (2005) 132 Cal.App.4th 359, 388.) Front pay is in lieu of reinstatement and is an award

---

[11] Hager's brief states, without citation to the record, that his medical expert testified "to a reasonable medical certainty that with surgery, he would likely be restored to full capacity to perform those duties." There was no such testimony before the jury.

of the salary and benefits a wrongfully discharged plaintiff would have earned had he or she been employed after trial. (*Mize-Kurzman*, *supra*, 202 Cal.App.4th at p. 873, fn. 17.) "Front pay is measured by the employee's projected earnings and benefits over the period of time until he or she is likely to become reemployed or likely to retire, where reemployment is unlikely." (*Id.* at pp. 873-874, fn. 17.)

Hager's economist based her opinion on the assumption that Hager could return to work as a deputy sheriff, which has no evidentiary support. (*Jennings v. Palomar Pomerado Health Systems, Inc.* (2003) 114 Cal.App.4th 1108, 1117.) Because the economist's testimony was based on the salary Hager would have earned as a deputy sheriff, it was based upon conclusions or assumptions not supported by the record and cannot constitute substantial evidence. (*Goehring v. Chapman University* (2004) 121 Cal.App.4th 353, 367-368.)

Hager, however, contends substantial evidence supports the jury's verdict based upon the reputational injury or the "blot on his resume," which prevented him from obtaining any employment in related fields. This reputational injury, or loss of future earning capacity, is distinct from front pay, which is the earnings the employee would have received from the defendant employer but for his wrongful termination. (See Chin et al., Cal. Practice Guide: Employment Litigation (The Rutter Group 2013) ¶ 17.228, p. 17-38; *Williams v. Pharmacia, Inc.* (7th Cir. 1998) 137 F.3d 944, 952 [" 'To recover for lost earning capacity, a plaintiff must produce "competent evidence suggesting that his injuries have narrowed the range of economic opportunities available to him. . . . [A] plaintiff must show that his injury has caused a diminution in his ability to earn a living." ' "].) Loss of earning power is an element of general damages. (Civ. Code, § 3333.)

The evidence does not support the award of damages for loss of future earning capacity. The economist's calculations, which Hager relies on, were based upon what he would have earned as a deputy sheriff, a job he can longer perform. Hager's vague testimony is not sufficient to suggest a diminution in his ability to earn a living caused by his reputational injury. The award of front pay cannot stand.

4. *The Trial Court Did Not Abuse its Discretion in its Evidentiary Rulings*

The County argues that the trial court committed prejudicial error in admitting evidence that shifted the focus away from the elements of Hager's whistleblower retaliation lawsuit toward whether Engels actually committed criminal acts. This contention is based on questions presented during trial to Engels, Brandenburg, and a parole officer regarding Aujay's disappearance and the connection between Engels and Hinkle, one of the targets of the DEA task force. Our recitation of the background facts is limited to the evidence upon which timely and specific objections were raised in the trial court. (Evid. Code, § 353, subd. (a); *Coit Drapery Cleaners, Inc. v. Sequoia Ins. Co.* (1993) 14 Cal.App.4th 1595, 1611.)

a. *Background Facts*

The County cites to Engels's testimony in which he was questioned regarding his whereabouts on the date of Aujay's disappearance, and his relationship with Hinkle. Defense counsel objected to the line of questioning related to Aujay's disappearance as "inappropriate," because it suggested Engels had "something to do criminally with the missing Deputy Aujay." The objection was overruled. With respect to Engels's testimony regarding his relationship with Hinkle, the County raised an objection to a question related to Engels's response to a radio call from Hinkle's house reporting an attempted murder.

The County also cites to Brandenburg's testimony in which he described the information he received from several sources during the course of his homicide investigation. The County raised hearsay objections to questions posed to Brandenburg eliciting the following testimony: (1) another deputy told him that Aujay had been murdered, and the deputy had information about Engels, referring to Engels as a "dirty deputy"; (2) a former narcotics officer told him that a methamphetamine lab was located adjacent to the area where Aujay's truck was located; (3) an inmate told him that he overheard people talking about murdering Aujay; and (4) an FBI agent also had obtained information that Aujay had been murdered.

32

b.  *The Trial Court Properly Exercised its Discretion in Admitting Evidence that Showed Hager had a Reasonable Belief of Deputy Misconduct*

The County contends the admission of Engels's testimony was prejudicial because the jury would be more likely to "reward plaintiff for his belief that Deputy Engels was involved in illicit activity if, in hindsight, the information [were] true."  As to the hearsay evidence, the County contends that this evidence sensationalized the trial resulting in prejudicial error.  We conclude the trial court properly exercised its discretion.

A trial court's ruling on the admissibility of evidence is reviewed for abuse of discretion.  (*Dart Industries, Inc. v. Commercial Union Ins. Co.* (2002) 28 Cal.4th 1059, 1078; *Pannu v. Land Rover North America, Inc.*, *supra*, 191 Cal.App.4th at p. 1317.)[12]  A judgment will not be reversed by reason of an erroneous admission of evidence unless a miscarriage of justice is shown.  (Evid. Code, § 353, subd. (b).)  "In civil cases, a miscarriage of justice should be declared only when the reviewing court, after an examination of the entire cause, including the evidence, is of the opinion that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.  [Citation.]"  (*Huffman v. Interstate Brands Corp.* (2004) 121 Cal.App.4th 679, 692.)

As to Engels's testimony, the trial court's ruling fell well within its discretion.  Hager was entitled to the protection of section 1102.5(b) if he had reasonable cause to believe that the information he disclosed was a violation of the law.  Hager's reasonable belief of Engels's involvement in Aujay's disappearance and in the methamphetamine organization in the Antelope Valley had been discredited by Holmes during the course of

---

[12]    In its reply brief, the County cites *Wiz Technology, Inc. v. Coopers & Lybrand* (2003) 106 Cal.App.4th 1, 12-13, for the proposition that our review of the trial court's rulings on hearsay objections is de novo.  *Wiz Technology* is a summary judgment case. In citing this standard of review, the court relied on our case, *Williams v. Saga Enterprises, Inc.* (1990) 225 Cal.App.3d 142.  (*Wiz Technology, Inc. v. Coopers & Lybrand*, at p. 13.)  We noted that the trial court did not rule on the evidentiary objections, and we stated "we must determine the validity of those objections ourselves since our standard of review is a de novo examination of the order which granted the motion for summary judgment."  (*Williams v. Saga Enterprises, Inc.*, at p. 149, fn. 2.)

his investigation. Holmes testified that there was no credible information from which Hager could have reasonably believed Engels had violated the law. Thus, the evidence elicited from Engels concerning his whereabouts on the day of Aujay's disappearance cast doubt on Holmes's investigation. This evidence was relevant and properly admitted to show Holmes did not thoroughly investigate Engels to follow up Hager's information concerning Engels's involvement in Aujay's disappearance.

We also conclude that the trial court's rulings on the County's hearsay objections were not an abuse of discretion. Brandenburg testified that he received the same information regarding deputy misconduct that Hager reported to Shreves. Brandenburg's testimony was not offered to prove the information was correct, only to show that Hager had a reasonable belief that Engels had violated the law. Brandenburg's testimony also cast doubt on Holmes's conclusion that Hager's sources were not credible, and Hager's reports regarding deputy misconduct were reckless.

Even if we were to conclude that the trial court erred in admitting this evidence, the County has not shown prejudice. Several witnesses testified regarding Hager's reports to Shreves, which detailed Hager's information about Engels. The County actually cited to and relied on Brandenburg's testimony, which it asserts was improperly admitted, to show that Brandenburg was the first to report deputy misconduct. Moreover, as to the testimony of the parole officer, which the County contends was improperly admitted, the County failed to object but thereafter cross-examined the witness. The jury heard that the parole officer did not believe the information he received about Engels's wrongdoing. On this record, there was no miscarriage of justice.

5. *The Trial Court Did Not Err in Denying the Motion for New Trial Based upon Juror Misconduct*

The County argues the trial court erred in denying its motion for new trial premised on juror misconduct. (Code Civ. Proc., § 657.) The argument on appeal is twofold. First, the trial court, upon hearing of misconduct, committed prejudicial error by not following the law. Second, the trial court erred in denying the new trial motion

34

because the presumption of prejudice arising from jurors discussing news reports about LASD corruption was not rebutted. We disagree with both arguments.

a. *The Trial Court Did Not Err in Protecting the Privacy of the Jurors by Requesting Permission to Release Their Identifying Information*

The County contends the trial court erred when it denied the County's application for the juror's personal identifying information (addresses and phone numbers) so the County could further investigate whether juror misconduct occurred in light of certain news reports. The County argued that it was entitled to the identifying information under Code of Civil Procedure section 237, subdivision (a)(1).

Code of Civil Procedure section 237, subdivision (a)(1) states: "The names of qualified jurors drawn from the qualified juror list for the superior court shall be made available to the public upon request unless the court determines that a compelling interest, as defined in subdivision (b), requires that this information should be kept confidential or its use limited in whole or in part." Subdivision (b) provides that the petition to the superior court for access to these records shall be "supported by a declaration that includes facts sufficient to establish good cause for the release of the juror's personal identifying information." The court is required to set a hearing upon a showing of good cause, unless there is a showing that establishes "a compelling interest against disclosure." (Code Civ. Proc., § 237, subd. (b).) "A compelling interest includes, but is not limited to, protecting jurors from threats or danger of physical harm." (*Ibid*.) If the court does not set the matter for hearing, it must make express findings of either lack of good cause or the presence of a compelling interest against disclosure. (*Ibid*.)

Contrary to the County's position, it is not entirely clear whether subdivision (b) of section 237 of the Code of Civil Procedure applies in a civil case. The reference to "personal juror identifying information," as used in subdivision (a)(2), and the use of a "criminal action" in the first sentence of subdivision (c) suggests that it does not. If subdivision (b) applies, then the trial court's decision to correspond with the jurors to seek permission to release their identifying information must have been based upon Hager's counsel's argument that there was a compelling interest against disclosure.

35

While the court made no express findings, there is no indication in the record the County asked for express findings, or the County objected to the procedure the trial court invoked to protect the juror's privacy. While only one juror granted permission to release his identifying information, the jurors had an absolute right not to talk to the County.

Notwithstanding subdivision (b) of Code of Civil Procedure section 237, there was no abuse of the court's inherent discretion to protect juror privacy. (See *Townsel v. Superior Court* (1999) 20 Cal.4th 1084, 1091, 1096 [entirely apart from Code Civ. Proc., § 237, court has inherent power to protect juror privacy in civil as well as criminal cases; exercise of that power is reviewed for abuse of discretion].) A litigant seeking juror's personal identifying information must make " 'a sufficient showing to support a reasonable belief that jury misconduct occurred, that diligent efforts were made to contact the jurors through other means, and that further investigation is necessary to provide the court with adequate information to rule on a motion for new trial. . . . [¶] Absent a satisfactory, preliminary showing of possible juror misconduct, the strong public interests in the integrity of our jury system and a juror's right to privacy outweigh the countervailing public interest served by disclosure of the juror information as a matter of right in each case.' " (*Id*. at pp. 1093-1094.) The County did not make the requisite preliminary showing in their ex parte application.

b. *The Record Reveals No Prejudicial Juror Misconduct*

During jury deliberations, multiple news sources reported on county-wide inmate abuse in the Los Angeles County jail system. Upon discharge of the jury, defense counsel told the court that the jury "had discussed recent media articles on the conduct of the Los Angeles County Sheriff's Department during deliberations and felt the Department was corrupt." As noted above, before moving for new trial, the County asked the court for the juror's personal identifying information. In response to the court's request, only one juror permitted the court to release his information. This juror did not submit a declaration to support the County's motion.

In its motion for new trial, the County offered another juror's declaration that stated: "During trial and before the verdict was reached in this matter, I heard another

36

juror mention they heard the Los Angeles County Sheriff's Department was in the news. The juror did not state any additional details regarding the story they had heard. In response, one or two other jurors stated that they had also heard recent news stories regarding the Los Angeles County Sheriff's Department."**13**

An order denying a motion for a new trial is not itself appealable. We review the order as part of the judgment. (*Walker v. Los Angeles County Metropolitan Transportation Authority* (2005) 35 Cal.4th 15, 19.) The scope of our review from the denial of a new trial on the ground of juror misconduct requires an examination of the entire record, including the evidence, and we independently determine whether an act of misconduct occurred and, if so, whether the act prevented the moving party from having a fair trial. (*Iwekaogwu v. City of Los Angeles* (1999) 75 Cal.App.4th 803, 818; see also *Whitlock v. Foster Wheeler, LLC* (2008) 160 Cal.App.4th 149, 158.)

The County contends that any information obtained about a party or the case from news reports creates a presumption of prejudice. In support of its assertion, the County cites cases in which jurors read news articles about the case during trial and prejudged the case (*People v. Ramos* (2004) 34 Cal.4th 494, 517-519; *Province v. Center for Women's Health & Family Birth* (1993) 20 Cal.App.4th 1673, 1678-1679, disapproved on other grounds in *Heller v. Norcal Mutual Ins. Co.* (1994) 8 Cal.4th 30, 41), heard news reports that the defendant made " 'threats against the guards . . . if he were given the death penalty' " (*People v. Zapien* (1993) 4 Cal.4th 929, 993-994), and were exposed to extraneous information during jury selection in the form of defendant's statements directed at the prosecutor that the defendant would " 'tear his head off' and that he had 'nothing to lose' " (*People v. McKinzie* (2012) 54 Cal.4th 1302, 1347). Here, the news reports had nothing to do with the case.

The County also cites *People v. Nesler* (1997) 16 Cal.4th 561, as support for the proposition that any information about a party leads to a presumption of prejudice. In

---

**13**     This portion of the declaration supporting the motion was admissible. (Evid. Code, § 1150, subd. (a).)

37

*Nesler*, a juror overheard damaging information concerning the defendant from a source outside the trial, failed to disclose this information to the court, and during deliberations passed on that information to other jurors. (*Id*. at pp. 578-579 (lead opn. of George, C.J.).) Unlike here, the information in *Nesler* was connected to the case.

Although the County characterizes the news reports as detailing "corruption" in the LASD, the news reports at issue here focused on the jail system, which had no connection with Hager's case. This out-of-court information does not appear to be information so prejudicial "that it is inherently and substantially likely to have influenced a juror," or resulted in actual bias against the County. (*People v. Nesler*, *supra*, 16 Cal.4th at pp. 578-579.)

But, even if we were to agree with the County that a juror who mentioned reading about the LASD, without further elaboration, and "one or two others" had heard news stories, raised a presumption of prejudice, the presumption was rebutted. " 'Some of the factors to be considered when determining whether the presumption is rebutted are the strength of the evidence that misconduct occurred, the nature and seriousness of the misconduct, and the probability that actual prejudice may have ensued.' " (*Province v. Center for Women's Health & Family Birth*, *supra*, 20 Cal.App.4th at p. 1679, citing *Hasson v. Ford Motor Co.* (1982) 32 Cal.3d 388, 417.)

In examining the record, we conclude there was no probability actual prejudice resulted from juror misconduct. Evidence of misconduct was not serious. The declarant was uncertain as to the identity of the jurors, there was no indication of the nature of the news they had heard, and the declaration lacks specificity regarding the juror's statements and the circumstances under which they were made. There also is no indication that these jurors violated the court's instructions not to "look for any information outside of the court." Thus, for the foregoing reasons, any juror misconduct was not "of such a character as is likely to have influenced the verdict improperly." (Evid. Code, § 1150, subd. (a).)

*Hager's Appeal*

Hager appeals from the trial court's order denying his motion for attorney fees under Code of Civil Procedure section 1021.5. Code of Civil Procedure section 1021.5 codifies the "private attorney general" doctrine of attorney fees. (*Conservatorship of Whitley* (2010) 50 Cal.4th 1206, 1210.) " '[T]he fundamental objective of the doctrine is to encourage suits enforcing important public policies by providing substantial attorney fees to successful litigants in such cases." (*Graham v. DaimlerChrysler Corp.* (2004) 34 Cal.4th 553, 565.) The statute authorizes the court to award attorney fees to a successful party in an action that "has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement . . . are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any." (Code Civ. Proc., § 1021.5.) All of the statutory requirements must be met. (*Satrap v. Pacific Gas & Electric Co.* (1996) 42 Cal.App.4th 72, 80-81.)

Because the issues presented here do not require us to construe the statute, we review the order denying attorney fees for an abuse of discretion. (*Collins v. City of Los Angeles* (2012) 205 Cal.App.4th 140, 152-153.) The questions we discuss are whether the court applied the proper legal standards and, if so, whether the result was within the range of the court's discretion. (*Lyons v. Chinese Hospital Assn.* (2006) 136 Cal.App.4th 1331, 1344.) We presume that the trial court properly applied the law and acted within its discretion unless affirmatively shown otherwise. (*Collins v. City of Los Angeles*, *supra*, at p. 153.)

As a preliminary matter, Hager appears to contend that the trial court order denying attorney fees without any stated reasons constitutes reversible error because, as a reviewing court, we cannot assess whether the trial court applied the proper legal standard. Hager has offered no legal support for this position and ignores the presumption that the court properly applied the law. Moreover, the failure to state reasons for a discretionary decision does not constitute, by itself, abuse of discretion.

(*Schwartz v. City of Rosemead* (1984) 155 Cal.App.3d 547, 555; see also *Satrap v. Pacific Gas & Electric Co.*, *supra*, 42 Cal.App.4th at p. 81, fn. 2.)  To be entitled to relief on appeal from an alleged abuse of discretion, it must be clear that the resulting injury is sufficiently grave to manifest an abuse of discretion.  The trial court did not abuse its discretion.

Hager next contends this action resulted in enforcement of an important right to be protected from whistleblower retaliation, which affects the public and satisfies the first criterion under Code of Civil Procedure section 1021.5, by conferring "a significant benefit . . . on the general public or a large class of persons[.]"  There are a number of published appellate cases that have awarded attorney fees to public safety officers who have sued to enforce rights, but we agree with the County that those cases are distinguishable, and the right Hager enforced did not rise to the level of conferring a significant benefit on the public.

In *Jaramillo v. County of Orange*, *supra*, 200 Cal.App.4th 811, attorney fees were awarded because the plaintiff obtained an injunction requiring the County to amend its executive management waiver forms to expressly include language that no POBRA rights may be included in the waiver.  (*Id*. at p. 827.)  The injunction did not just benefit the plaintiff, or the executive-level sheriffs who will now know that they are not waiving POBRA protections, but it also inured to the benefit of the County by lessening the probabilities of abuse and corruption in the sheriff's office.  (*Id*. at p. 829.)

In *Riverside Sheriffs' Assn. v. County of Riverside* (2007) 152 Cal.App.4th 414, a sheriff's association brought an action against the County after the County denied certain deputy sheriffs, who were the subject of a criminal investigation, access to employee representatives as required under POBRA.  (*Id*. at p. 418.)  The appellate court affirmed the trial court's award of attorney fees, reasoning that POBRA rights and protections benefit not only public safety officers but the public at large, transcending the employer-employee relationship.  (*Id*. at p. 422.)  "These principles hold true even where a party enforces an existing right."  (*Ibid*.)

In *Otto v. Los Angeles Unified School Dist.* (2003) 106 Cal.App.4th 328, we reversed a trial court order denying attorney fees to a school public safety officer who successfully challenged his employer's refusal to afford him an administrative appeal from a written memorandum that was critical of his job performance, which was allegedly a punitive action implicating POBRA. (*Id.* at pp. 330-331.) We concluded the issue of what constituted a "punitive action" under POBRA had widespread implications for law enforcement agencies and their employees across the state, and thus the lawsuit had conferred a significant public benefit by "furthering the public's interest in effective law enforcement." (*Id.* at pp. 334-335.)

Hager also directs our attention to *Robinson v. City of Chowchilla* (2011) 202 Cal.App.4th 382, 394, but in that case, like those cited above, Robinson successfully prosecuted POBRA rights that conferred a significant benefit on the general public. Robinson challenged his removal as chief, which resulted in a published case determining that the city's removal of its police chief from office without notice, a statement of reasons, or an opportunity for an administrative appeal violates POBRA (Gov. Code, § 3304, subd. (c)). (*Robinson v. City of Chowchilla*, *supra*, at pp. 387, 395-399.)[14]

We do not agree with Hager's assertion that any action alleging a violation of a right, whether under POBRA or the Labor Code, necessarily confers a significant benefit to the public, regardless of the nature of the alleged violations or the underlying circumstances. Unlike the plaintiffs in *Jamarillo*, *Riverside Sheriffs' Assn.*, *Otto*, and *Robinson*, whose lawsuits benefited all public safety officers and the public at large, this action only benefited Hager. An action that rectifies illegal private or public conduct, including a suit brought under section 1102.5(b) standing alone, does not establish that

---

**14**    Hager also relies on *Bowman v. City of Berkeley* (2005) 131 Cal.App.4th 173, and *Press v. Lucky Stores, Inc.* (1983) 34 Cal.3d 311, but these cases, unlike Hager's case, are similar to those cited above and vindicated important constitutional rights of due process, freedom of speech, and freedom to petition, which conferred a significant benefit on the general public. (*Bowman*, *supra*, at pp. 179-181; *Press*, *supra*, at pp. 318-319.)

41

the action conferred a significant benefit on the public.  (See *Satrap v. Pacific Gas & Electric Co.*, *supra*, 42 Cal.App.4th at pp. 81-82.)

In sum, Hager has not met the first criterion for obtaining an attorney fees award under Code of Civil Procedure section 1021.5.  Therefore, the trial court did not abuse its discretion in denying Hager's motion.

DISPOSITION

The judgment is reversed as to the award of $2,006,015 in damages, and is otherwise affirmed. The order denying the motion for attorney fees is affirmed. The parties are to bear their own costs on appeal.

ALDRICH, J.

We concur:

CROSKEY, Acting P. J.

KITCHING, J.

43

**CERTIFIED FOR PARTIAL PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
SECOND APPELLATE DISTRICT
DIVISION THREE

| | |
|---|---|
| DARREN HAGER, | B238277 |
| Plaintiff and Respondent, | |
| v. | (Los Angeles County Super. Ct. No. BC370326) |
| COUNTY OF LOS ANGELES et al., | |
| Defendants and Appellants. | |
| DARREN HAGER, | B239897 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC370326) |
| v. | |
| COUNTY OF LOS ANGELES et al., | ORDER MODIFYING OPINION AND CERTIFYING OPINION FOR PARTIAL PUBLICATION [NO CHANGE IN JUDGMENT] |
| Defendants and Respondents. | |

It is ordered that the opinion filed herein on August 5, 2014, be modified as follows:

On page 2, before the initial paragraph, insert the heading, "INTRODUCTION."

On page 3, line 13, delete the paragraph beginning with "We conclude the trial court did not abuse its discretion" and insert the following paragraph:

"We conclude the County's interpretation of section 1102.5(b) as limiting whistleblower protection to the first employee who discloses a violation of state or federal law that had not been previously disclosed by another employee is contrary to the plain statutory language and legislative intent in enacting section 1102.5(b). In the unpublished portion of this opinion, we further conclude the trial court did not abuse its discretion in excluding evidence of undisclosed reasons for

terminating Hager. The record contains affirmative indications the trial court considered and understood that the introduction of undisclosed reasons for the decision to terminate Hager was not relevant and was prejudicial. We further conclude there is no substantial evidence to support the jury's award of economic damages. Accordingly, we reverse that portion of the judgment, but in all other respects we affirm. We also affirm the order denying Hager's motion for attorney fees."

On the court's own motion, it appears that our opinion addressing Labor Code section 1102.5, subdivision (b), meets the standards set forth in California Rules of Court, rule 8.1105(c) and 8.1110. The Introduction, beginning on page 2 of this opinion, the Factual and Procedural History, part 1 of the Discussion, ending on page 16, and the Disposition of this opinion on page 43 are ordered published in the Official Reports.

There is no change in the judgment.

2