Filed 9/9/19; Certified for Partial Publication 9/25/19 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| TODD HAWKINS et al., <br><br> Plaintiffs and Respondents, <br><br> v. <br><br> CITY OF LOS ANGELES, <br><br> Defendant and Appellant. | B279719, B282416 <br><br> (Los Angeles County <br> Super. Ct. Nos. <br> BC541066, BC543766) |

APPEALS from judgments and orders of the Superior Court of Los Angeles County, Ernest M. Hiroshige, Judge.  Affirmed.

Michael N. Feuer, City Attorney, Blithe S. Bock, Assistant City Attorney, and Paul L. Winnemore, Deputy City Attorney, for Defendant and Appellant.

The Myers Law Group, David P. Myers and D. Smith for Plaintiffs and Respondents.

_____

The City of Los Angeles (the City) fired Todd Hawkins and Hyung Kim[1] from their jobs as hearing examiners at the Department of Transportation (DOT). Claiming they were fired for whistleblowing on the City's practice of pressuring hearing examiners to change decisions, Hawkins and Kim sued the City for violations of the Bane Act and for whistleblower retaliation. After a jury found for Hawkins and Kim on those causes of action, the trial court assessed a penalty under the Private Attorney General Act (PAGA) and awarded them attorney fees. The City appeals, contending the judgments must be reversed for insufficient evidence and instructional error. They also contend that the awards of civil penalties and attorney fees must be reversed. We reject these contentions and affirm the judgments and orders.

## BACKGROUND

I.   The lawsuit

Hawkins and Kim (collectively plaintiffs) separately sued the City for whistleblower retaliation under Labor Code section 1102.5,[2] violation of the Bane Act (Civ. Code, § 52.1), violation of federal civil rights (42 U.S.C. § 1983); and violation of Government Code section 815.6.[3] Hawkins, but not Kim, also alleged a cause of action under the Fair Employment and Housing Act (FEHA).

---

[1] During the pendency of this appeal, Kim died. Lawrence A. Dean, II substituted in as guardian ad litem for Kim.

[2] All further statutory references are to the Labor Code unless otherwise indicated.

[3] Government Code section 815.6 imposes liability on a public entity for injury resulting from failure to discharge a mandatory duty.

2

Plaintiffs, individually and "on behalf of the general public," asked for penalties under PAGA (§ 2698 et seq.). They also asked for attorney fees. The cases were consolidated for a jury trial, at which the following evidence was elicited.[4]

## II. DOT's parking adjudication division

The parking adjudication division of the DOT handles appeals from individuals contesting parking fines, citations, and impounds. After issuance of a notice of parking violation, a person may request an initial review. (Veh. Code, § 40215, subd. (a).) If the person is dissatisfied with the results of that review, he or she may request an administrative hearing but must pay the parking penalty. (*Id.*, subd. (b).) A hearing examiner presides over the hearing which shall provide "an independent, objective, fair, and impartial review of contested parking violations." (*Id.*, subd. (c)(3).) Hearings are recorded, and the hearing examiner issues a written decision. If the hearing examiner finds the individual not liable, then the City issues a refund.

John Fick supervised the parking adjudication division until he retired in 2012. Thereafter, Ricardo Sanchez, who managed the Van Nuys parking adjudication office, and Kenneth Heinsius, who managed the Civic Center parking adjudication office, rotated into the supervisory position every four months. Walton-Joseph, who had been a hearing officer, was promoted to acting office manager of the West Los Angeles parking adjudication office in 2011.

Plaintiffs were part-time hearing examiners, used on an as-needed basis. As such, they were at-will employees not entitled to civil service protections, including progressive discipline. Plaintiffs

---

[4] Hawkins also sued Carolyn Walton-Joseph, a DOT employee, but she was dismissed before trial.

3

adjudicated parking citations and impounds. Hawkins began working for the City in February 2000. Kim began working for the City in 2006.

III. The June to August 2011 altercation between Hawkins and Walton-Joseph

Walton-Joseph supervised Hawkins when he worked at the West Los Angeles office after she took over as acting manager. From the outset, they did not get along. In June 2011, Walton-Joseph objected to language Hawkins used in a decision. When he responded that nobody had objected to that language during his 11 years as a hearing examiner, she "stormed" into his office, screaming and yelling that she did not care what other office managers did. When Hawkins asked her to treat him professionally and respectfully, she told him that his problem was that he thought he was White.[5] She warned him that she would be promoted to office manager and when that happened "there will be some changes around here and I'm going to start with you."

Hawkins immediately reported the incident to Sanchez, who told him to report it to Fick. Fick, however, merely advised Hawkins to get along with Walton-Joseph, because she was going to be promoted to office manager, which in fact happened later that month.

Not long after this incident, Walton-Joseph called Hawkins into a meeting on August 3, 2011 with Heinsius. She told Hawkins that members of the public had complained about him. Believing that Walton-Joseph had trumped up the charges to retaliate against him, Hawkins complained again to Fick and, on August 9,

---

[5] Walton-Joseph and Hawkins are Black.

filed a complaint with the Equal Employment Opportunity Commission.

The next day, August 10, 2011, Walton-Joseph asked Hawkins to review a notice to correct his inappropriate conduct at hearings. This led to another angry confrontation between the two, resulting in Hawkins being told to leave the office until the matter was resolved. He was not scheduled to work again until November 7, 2011. According to Oliver Quirante, who worked in personnel and advised on human resource matters, Hawkins was allowed to come back to work because they were shorthanded, notwithstanding that the incident between Hawkins and Walton-Joseph was unresolved.

As a result of Hawkins's August 10, 2011 altercation with Walton-Joseph, Robert Andalon, DOT's assistant manager, asked that Hawkins be disciplined. However, as we later discuss, no action was taken on the request for discipline until years later.

IV.    Complaints that hearing examiners were pressured to change decisions

Around the time Walton-Joseph began managing the West Los Angeles office, hearing examiners began to tell Sanchez that Walton-Joseph and Heinsius were pressuring them to change decisions, generally from not liable to liable, meaning that people who had challenged their tickets were not getting refunds to which hearing examiners had found they were entitled. Over the years, approximately 14 hearing examiners, including Hawkins and Kim, complained to Sanchez.

In July 2012, Hawkins started to leave anonymous messages at the executive office that hearing examiners were being told to change decisions. When nothing happened, he met with Sanchez

and Wayne Garcia, the division head for parking operation and support, to voice his concerns, but nothing came of the meeting.

The next month, in a letter dated August 16, 2012, Kim complained to Garcia about Walton-Joseph's unprofessional behavior. He also "raised other issues about . . . Walton[-Joseph]. . . . I feel that one issue that must be mentioned is her instances of having decisions changed. I myself have changed decisions. However, this was based on valid grounds. I have heard that some changes were not based on such concrete grounds. This course of action would jeopardize the entire Administrative Hearing process due to a lack of independence and undue coercion."

Plaintiffs were not the only people to voice concerns. Hearing examiner Surapong Kunkaew wrote a memorandum to Fick in November 2011 about Walton-Joseph's abrasive and aggressive management style. Although he did not refer to being pressured to change decisions in his memorandum, he admitted at trial that had been a concern at the time.

On May 2, 2013, having received no response to his complaints, Hawkins anonymously wrote to DOT's General Manager Jaime de la Vega about " 'the problem' " in the West Los Angeles office. The problem was Walton-Joseph, who "scream[ed] and yell[ed]" at hearing examiners to change their written decisions from not liable to liable. Hawkins identified eight hearing examiners who could corroborate his charges, including himself, Kim, and Kunkaew. Hawkins also attached Kim's August 16, 2012 letter to Garcia raising similar complaints. Although Hawkins did not sign the letter, it was no secret he authored it: he told colleagues he wrote it. Moreover, he sent a follow-up letter to de la Vega on June 30, 2013 identifying himself as the author of the

May 2 complaint and referring de la Vega to two more hearing examiners who could substantiate his claims about Walton-Joseph.

Not long after Hawkins sent that May 2, 2013 complaint, Heinsius identified a hearing Kim had conducted in which Kim had off the record discussions and found the hearing complainant not liable because she was a member of the California State Bar in good standing. Heinsius told Walton-Joseph about the hearing and that they needed to monitor Kim's hearings. Kim was then counseled about his improper conduct during two hearings.

Meanwhile, Andalon asked Garcia to investigate complaints that hearing examiners were being asked to change their decisions. As part of that investigation, Garcia interviewed hearing examiners. All said Heinsius or Walton-Joseph had asked them to change decisions. They also complained about Walton-Joseph's management style, describing her as mean, a bully, and demeaning to others. Garcia asked Walton-Joseph and Heinsius to respond to the allegations. She denied them; he merely shook his head.

Garcia issued a written report in September 2013. Garcia reported low morale and that Heinsius and Walton-Joseph did not separate their administrative responsibilities from the quasi-judicial function of hearing examiners. Garcia found the allegation that Walton-Joseph and Heinsius forced hearing examiners to change decisions substantiated. However, he also concluded that they gave strong rationales for compelling different decisions and found Walton-Joseph and Heinsius did not abuse their authority under the Vehicle Code. Although his recommendations did not include any discipline for Walton-Joseph and Heinsius, he did recommend hiring a senior management analyst to oversee the adjudication division, reminding managers not to engage in rendering decisions on adjudicated parking citations, telling

hearing examiners to notify their division head if they felt forced to change hearing decisions, and setting a new tone for working relationships.

Garcia passed his report up the chain of command to Andalon who, as assistant manager, was just below the general manager. On October 8, 2013, Andalon found there was insufficient evidence to support the allegations against Heinsius and Walton-Joseph. However, he recommended reminding hearing examiners that their decisions had to comply with the training manual and telling office managers to verify that decisions complied with the law. The matter was therefore considered closed.

Unsatisfied with this conclusion, Hawkins took his complaints outside the DOT, to the City Ethics Commission and members of the City Council.

V.      The City fires plaintiffs

On October 1, 2013, just days before issuing his findings, Andalon had Heinsius look into complaints about the "disruptive or unprofessional conduct" of various employees. In response, Heinsius identified Hawkins, Kim, and Kunkaew as subjects for investigation.

The City fired Hawkins on November 19, 2013. At trial, Quirante said that Hawkins was fired in November 2013 because of the August 2011 request for discipline, which had remained an open investigation. Because of staffing issues, human resources simply never got around to it.

The City fired Kim on December 23, 2013, ostensibly because of his conduct at two hearings in May and June 2013.

VI.     The jury's verdicts

The jury found for plaintiffs on their Bane Act and whistleblower causes of action but against them on their federal civil rights claims.  The jury also found against Hawkins on his FEHA cause of action.  As to the Bane Act cause of action, the jury found that the City engaged in conduct that interfered or attempted to interfere by threats, intimidation, or coercion with plaintiffs' right to complain about a supervisor engaging in conduct inconsistent with the Vehicle Code.  As to the section 1102.5 cause of action for retaliation, the jury found that plaintiffs' disclosure that a supervisor pressured hearing examiners to change decisions was a contributing factor to the City's decision to fire plaintiffs.  The City, however, did not prove it would have fired plaintiffs for legitimate, independent reasons even if they had not complained.  The jury awarded Hawkins $238,531 and Kim $188,631 in damages, respectively.

The trial court assessed a $20,000 penalty under PAGA and awarded plaintiffs $1,054,286.88 in attorney fees.

## DISCUSSION

I.     Sufficiency of the evidence of retaliation

The jury found for plaintiffs on their causes of action under section 1102.5, subdivision (b), which is "California's general whistleblower statute."  (*Carter v. Escondido Union High School Dist.* (2007) 148 Cal.App.4th 922, 933.)  That section prohibits an employer from retaliating against an employee for disclosing to a government or law enforcement agency a violation of state or federal statute.  (§ 1102.5, subd. (b).)  The section reflects a public policy of encouraging workplace whistleblowers to report unlawful

9

acts without fear of retaliation.  (*McVeigh v. Recology San Francisco* (2013) 213 Cal.App.4th 443, 468.)

To establish a violation, a plaintiff must make a prima facie case of retaliation.  To do that, plaintiff must show he engaged in protected activity, his employer subjected him to an adverse employment action, and the existence of a causal link between the two.  If plaintiff meets his prima facie burden, defendant has the burden to prove a legitimate, nonretaliatory explanation for its actions.  The plaintiff must then show that the explanation is a pretext for the retaliation.  (*Hager v. County of Los Angeles* (2014) 228 Cal.App.4th 1538, 1540.)

Where, as here, a party contends insufficient evidence supports a jury verdict on retaliation, we apply the substantial evidence standard of review.  (*Wilson v. County of Orange* (2009) 169 Cal.App.4th 1185, 1188.)  We view the evidence in the light most favorable to the prevailing party, giving the evidence the benefit of every reasonable inference and resolving all conflicts in its favor.  (*Lenk v. Total-Western, Inc.* (2001) 89 Cal.App.4th 959, 968.)  " '[N]either conflicts in the evidence nor " 'testimony which is subject to justifiable suspicion . . . justif[ies] the reversal of a judgment, for it is the exclusive province of the [jury] to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.' " ' "  (*Ibid.*)  Thus, our power begins and ends with a determination of whether there is any substantial evidence, contradicted or uncontradicted, which will support the verdict.  (*Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 766.)

A. *Plaintiffs' prima facie case*

Plaintiffs established the three elements of their prima facie case.  First, disclosing an illegal activity is protected activity.

(§ 1102.5, subd. (b); *Mize-Kurzman v. Marin Community College Dist.* (2012) 202 Cal.App.4th 832, 853–854.) Hawkins, in his May 2, 2013 complaint, and Kim, in his August 2012 complaint, disclosed that Walton-Joseph pressured hearing examiners to change decisions, in violation of the Vehicle Code. The City makes no argument that such conduct complies with the Vehicle Code, and we therefore treat this as a concession the conduct is illegal.

Instead, the City minimizes plaintiffs' complaints as being mere "personal grievances" about Walton-Joseph's "management style." Certainly, Walton-Joseph's management style concerned plaintiffs and, by itself, might not be actionable. (See, e.g., *Patten v. Grant Joint Union High School Dist.* (2005) 134 Cal.App.4th 1378, 1385 [complaining about internal personnel matters not protected activity].) However, plaintiffs simultaneously complained about violations of the Vehicle Code. Therefore, whether plaintiffs devoted the bulk of their written complaints to Walton-Joseph's poor management style or to her pressuring hearing examiners to change decisions is irrelevant. The point is plaintiffs disclosed the violations. Indeed, the City admitted the alleged violations of the Vehicle Code formed the essence of plaintiffs' case. The City's counsel, when examining Walton-Joseph at trial, referred to the "heart of why we're here. There are a lot of complaints made by various hearing examiners as to you forcing them to change their decisions."

Next, plaintiffs established the second element of their prima facie case: the City subjected plaintiffs to an adverse employment action by firing them.

We therefore proceed to the third element of plaintiffs' prima facie case, whether a causal link exists between plaintiffs' whistleblowing and their termination. Circumstantial evidence

11

such as proximity in time between protected activity and alleged retaliation may establish a causal link.  (*Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 69, 105.)  Here, Kim raised his concerns in writing in August 2012.  Hawkins raised them in writing in May 2013.  Hawkins's complaint prompted a formal investigation, which concluded in October 2013.  Plaintiffs were fired soon thereafter, Hawkins in November 2013 and Kim in December 2013.  The closeness in time from the complaints and investigation to the City's firing of plaintiffs establishes the requisite causal link.

Even if we found that a long period elapsed between the protected activity and the terminations, a causal connection between them would still be established so long as the City engaged in a pattern of conduct consistent with a retaliatory intent.  (See *Wysinger v. Automobile Club of Southern California* (2007) 157 Cal.App.4th 413, 421.)  In 2013, after Kim complained about being pressured to change decisions, he was counseled about how he handled two hearings.  Then, in August 2013, on a day when Kim called in sick Heinsius made Kim get a doctor's note, which was unusual after just a one-day illness.  Similarly, Hawkins had been openly and anonymously complaining about violations of the Vehicle Code since July 2012.  Thereafter, he was counseled in January 2013.  The jury could have believed that the City's pattern of counseling Kim and Hawkins was part of a retaliatory conduct.

B. *Legitimate, nonretaliatory reasons for the terminations*

Plaintiffs having established their prima facie case, the burden shifts to the City to establish legitimate, nonretaliatory reasons for firing plaintiffs.  We will assume that the City met that burden.  There was evidence plaintiffs had engaged in improper conduct at times during hearings.  Kim did not dispute at trial that

12

his conduct at two hearings warranted counseling. Hawkins also had been counseled throughout his tenure at the City, the last time in January 2013, and members of the public had complained about his brusque and dismissive manner. We therefore proceed to the final element of plaintiffs' retaliation cause of action.

C. *Pretext*

In responding to an employer's showing of a legitimate reason for the complained-of action, a plaintiff cannot show merely that the employer's decision was wrong, mistaken, or unwise. (*Morgan v. Regents of University of California*, *supra*, 88 Cal.App.4th at p. 75.) Rather, the employee must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for a nondiscriminatory reason. (*Ibid.*)

Here, there was evidence to support the jury's finding that the City's proffered reasons for firing plaintiffs were pretextual. First, there was evidence plaintiffs were not fired because of how they conducted hearings or for behavioral problems. As to Hawkins, in 2011 and before, issues had been raised about his behavior at hearings and at the office. Yet, despite being placed on a months-long leave in summer 2011, Hawkins was allowed to return to work in November 2011. Also, Hawkins was last counseled about his conduct in January 2013. Yet, he was not fired until 10 months later, in November 2013. Thus, notwithstanding the supposed problems with Hawkins's work, he was allowed to continue working time and again. Only after Hawkins complained in writing, thereby prompting an investigation which found against him, was he fired. To this, add Sanchez's testimony about that last January 2013

13

counseling session. Sanchez, who was Walton-Joseph and Heinsius's fellow office manager, testified about irregularities surrounding that counseling session. Specifically, although Heinsius supervised the office where the alleged misconduct occurred, Sanchez, and not Heinsius, was instructed to counsel Hawkins. At trial, Sanchez openly wondered why he was told to conduct the counseling session. From this, the jury could have reasonably inferred that the City was punishing Hawkins for his prior complaints rather than any improper conduct at hearings.

Similarly, Kim had just two counseling sessions between May and July 2013. Before that, he was meeting standards and was rated "competent" in a 2012 performance evaluation. Thus, the jury could have found that Kim's miniscule record of discipline was not why he was fired.

Second, there was overwhelming evidence that Walton-Joseph and Heinsius pressured hearing examiners to change decisions, thereby giving the City a motive to fire people who complained. Lily Mazala testified that Heinsius and Walton-Joseph told her to change decisions: "Liable. Liable. Liable. Everything had to be liable." Harunobu Nishii testified that Walton-Joseph interfered with his decisions, asking him to consider evidence not presented at hearings. Sheri Ross refused Heinsius's request that she change a decision, telling him if he wanted it changed, he could sign his own name. Kunkaew also had been asked to change decisions. Even the City's own witness, Cynthia Duenas, agreed that Walton-Joseph told her to change a decision, albeit from liable to not liable. Of the hearing examiners who complained, three put their complaints in writing: Hawkins, Kim, and Kunkaew. All three complained about Walton-Joseph's management style. But only plaintiffs raised the additional issue of interference with the impartial hearing process.

This evidence shows that the City singled out plaintiffs from others who complained. Indeed, Walton-Joseph made statements to Hawkins that the jury could have found were direct threats of retaliation. After their altercation in August 2011, she told Hawkins that when she became office manager there would be changes, starting with him. Although Hawkins wasn't fired until two years after this threat, a reasonable inference is that Walton-Joseph made good on it after Hawkins complained about her interference in the hearing process.

Third, the City points to evidence that a supposedly disinterested party, Shelly Del Rosario, decided to fire plaintiffs. Del Rosario became the senior personnel analyst in August 2013. She inherited a backlog of discipline matters going back to 2009, including the August 2011 case pertaining to Hawkins. Based on her review of plaintiffs' files, she recommended firing them. The jury could have found this explanation for firing plaintiffs implausible. Quirante, the City's designated person most knowledgeable about the terminations, testified at trial that Hawkins was fired in 2013 based on the 2011 request for discipline. Yet, Quirante did not mention the 2011 request for discipline as the basis for Hawkins's 2013 termination at his deposition. The jury was entitled to reject the City's explanation that it fired Hawkins in 2013 for something he did in 2011. (See *Stevens v. Parke, Davis & Co.* (1973) 9 Cal.3d 51, 67–68 [jury may weave cloth of truth from evidence].)

Finally, we cannot discount that the jury may have resolved credibility determinations against the City. Walton-Joseph, for example, denied asking hearing examiners to change decisions and denied that she yelled or otherwise behaved inappropriately. However, Sanchez testified that numerous hearing examiners

15

complained about Walton-Joseph. Sanchez also personally saw Walton-Joseph "lose it" after he admonished her about her comment that Hawkins was not Black enough. Moreover, hearing examiners uniformly testified about Walton-Joseph's unprofessional behavior. Thus, the jury could have weighed Walton-Joseph's denials about her misconduct against the testimony of numerous hearing examiners and her fellow office manager to conclude that the City's proffered reasons for firing plaintiffs were implausible.

## II.  PAGA penalty

The trial court assessed $20,000 in penalties under PAGA against the City, with $5,000 payable to plaintiffs and $15,000 payable to the Labor and Workforce Development Agency (LWDA). The City contends that the penalty award must be reversed because plaintiffs did not comply with prefiling notice requirements.[6] We disagree.

The Legislature enacted PAGA to further the public interest of allowing aggrieved employees acting as private attorneys general to recover civil penalties for Labor Code violations, with the understanding that labor law enforcement agencies retain primacy over private enforcement efforts. (*Lopez v. Friant & Associates, LLC* (2017) 15 Cal.App.5th 773, 777–778.) Under PAGA, an aggrieved employee may file a representative action on behalf of himself or herself and other current and former employees to recover civil penalties. (*Id.* at p. 777.) PAGA claims function "as a substitute for an action brought by the government itself." (*Arias v.*

---

[6] Although plaintiffs take a more expansive view of the City's argument in their respondents' brief, we view it as limited to the adequacy of plaintiffs' notice they were pursuing a representative action.

16

*Superior Court* (2009) 46 Cal.4th 969, 986.)  Before a plaintiff may pursue a PAGA claim, he or she must comply with section 2699.3. That section requires an aggrieved employee, before filing a civil action, to give written notice to the LWDA and to his or her employer of the "specific provisions of this code alleged to have been violated, including the facts and theories to support the alleged violation."  (§ 2699.3, subd. (a)(1)(A); *Williams v. Superior Court* (2017) 3 Cal.5th 531, 545.)

The City complains that plaintiffs did not comply with prefiling notice requirements, citing *Kahn v. Dunn-Edwards Corp.* (2018) 19 Cal.App.5th 804 (*Kahn*).  The terse prefiling notice in *Kahn* referred to " '*my* claims' " regarding improper wage statements, and to a failure to pay " 'all of *my* earned wages,' " all without reference to any other current or former employee.  (*Id.* at p. 807.)  Because plaintiff Kahn's notice "applied only to him, it failed to give the [LWDA] an adequate opportunity to decide whether to allocate resources to investigate Kahn's representative action."  (*Id.* at p. 809.)  Because the notice suggested only an individual violation, it also failed to give the employer notice that it was a representative claim.  (*Ibid.*)

We express no opinion as to the correctness of *Kahn*'s holding. Whether correct or not, we do not interpret *Kahn* so literally as to hold that a plaintiff whose prefiling notice uses the incorrect pronoun—I instead of we and my instead of our—fails to comply with the Labor Code's administrative procedures.  Rather, we must determine whether the prefiling notice, as a totality, gave the requisite notice.

Plaintiffs' prefiling notices are materially different than the notice in *Kahn*.  Their notices referred to complaints that Walton-Joseph had hearing *officers* change written decisions from not liable

17

to liable.  Hawkins referred to Walton-Joseph's actions "in coercing *employees, including Claimant to change their decisions*."  (Italics added.)  Similarly, Kim referred to another hearing examiner who had complained to government officials about the conduct.  Thus, the notices here expressly referred to conduct not limited to the individual complainants.  They complained about conduct that impacted them and fellow hearing examiners, as well as the public.  We therefore conclude that plaintiffs complied with section 2699.3.

III.    Attorney fees

The trial court found that plaintiffs were entitled to their attorney fees under the Bane Act, PAGA, and Code of Civil Procedure section 1021.5.  The City contends that plaintiffs were not entitled to attorney fees under those statutes.  We have already rejected the City's claim that plaintiffs did not properly bring a PAGA claim.  Therefore, attorney fees were appropriate under that law.  (Lab. Code, § 2699, subd. (g)(1).)  And, as we next discuss, fees were also appropriately awarded under Code of Civil Procedure section 1021.5.

Code of Civil Procedure section 1021.5 codifies the private attorney general doctrine adopted in *Serrano v. Priest* (1977) 20 Cal.3d 25.  The section provides that a court may award attorney fees to a successful party in any action which has resulted in the enforcement of an important right affecting the public interest if: (1) a significant benefit, pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (2) the necessity and financial burden of private enforcement, or of enforcement by one public entity against another public entity, are such as to make the award appropriate, and (3) such fees should not in the interest of justice be paid out of any recovery.  (Code Civ. Proc., § 1021.5.)  Whether a party claiming attorney fees has met

18

his or her burden of proving these prerequisites rests within the trial court's sound discretion, which shall not be disturbed on appeal absent a clear abuse. (*Ryan v. California Interscholastic Federation* (2001) 94 Cal.App.4th 1033, 1044.) Enforcement through litigation of a constitutional or statutory policy does not necessarily confer a significant public benefit. (*Woodland Hills Residents Assn., Inc. v. City Council* (1979) 23 Cal.3d 917, 939.) Rather, the "significance of the benefit conferred is determined from a realistic assessment of all the relevant surrounding circumstances." (*Ryan*, at p. 1044.)

Here, the City argues that a significant benefit was not conferred on the public because all the action did was remedy retaliation for whistleblowing. However, the City ignores the trial court's finding that the action also conferred a significant public benefit because the public is entitled to fair hearings with respect to parking citations.[7] The Vehicle Code entitles the public to "an independent, objective, fair, and impartial review of contested parking violations." (Veh. Code, § 40215, subd. (c)(3).) Plaintiffs' action revealed that, for years, the City had been pressuring, sometimes successfully, hearing examiners to change decisions, usually to find that refunds were not warranted. In short, the public had been deprived of independent and impartial hearings. Instead, the City undermined the process provided by the Vehicle Code to generate revenue. It is "difficult to imagine a more fundamental public right than that the tribunal deciding a litigant's fate, even a tribunal convened at the first level of review to

---

[7] The City also suggests that no benefit was conferred on the public because the internal investigation Garcia conducted found no instances of misconduct. In other words, the City did not engage in misconduct because the City said so.

19

determine whether a litigant is liable for a parking violation, be a tribunal properly convened under the law and authorized by law to make the decision." (*Weiss v. City of Los Angeles* (2016) 2 Cal.App.5th 194, 220; see *Goldberg v. Kelly* (1970) 397 U.S. 254.)

IV. Contentions regarding the Bane Act

The City has raised several contentions regarding the Bane Act, including that there was insufficient evidence to support the verdict on that cause of action and that instructional error requires its reversal. Given that we have upheld the verdict on the section 1102.5 cause of action for retaliation, we need not reach the Bane Act issues. That is, the damages plaintiffs sought and were awarded on the Bane Act cause of action were the same as on the retaliation cause of action. Therefore, even if we reversed the verdict on the Bane Act, there would be no impact on the damage awards because we are not reversing the section 1102.5 verdict. In addition, we have explained why the attorney fees award does not depend on the viability of the Bane Act cause of action. No miscarriage of justice thus could accrue to the City from any error regarding the Bane Act. (See Cal. Const., art. VI, § 13.)

## DISPOSITION

The judgments and orders are affirmed. Todd Hawkins and Hyung Kim are awarded their costs on appeal.

DHANIDINA, J.

We concur:

LAVIN, Acting P. J.        EGERTON, J.

20

Filed 9/25/19

# CERTIFIED FOR PARTIAL PUBLICATION*

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| TODD HAWKINS et al.,<br><br>    Plaintiffs and Respondents,<br><br>    v.<br><br>CITY OF LOS ANGELES,<br><br>    Defendant and Appellant. | B279719, B282416<br>(Los Angeles County<br>Super. Ct. Nos. BC541066,<br>BC543766)<br><br>CERTIFICATION AND<br>ORDER FOR PARTIAL<br>PUBLICATION |

The opinion in the above-entitled matter filed September 9, 2019, was not certified for publication in the Official Reports. For good cause it now appears that the opinion should be partially published in the Official Reports and it is so ordered.

DHANIDINA, J.          LAVIN, Acting P. J.          EGERTON, J.

---

    * Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts II and IV of the Discussion.